Albert George PROGUE, Johnny James Williams, and Roosevelt Washington

v.

**J. D. MIDDLEBROOK, Acting Warden of the Louisiana State Penitentiary.**

Civ. A. No. 12540.

United States District Court
W. D. Louisiana,
Shreveport Division.

July 28, 1967.

Dan A. Spencer, Shreveport, La., for plaintiffs.

Jack P. F. Gremillion, Atty. Gen. of Louisiana, Teddy W. Airhart, Jr., Asst. Atty. Gen. of Louisiana, Baton Rouge, La., John A. Richardson, Dist. Atty. for First Judicial Dist., Shreveport, La., for defendant.

## OPINION ON THE MERITS

BEN C. DAWKINS, Jr., Chief Judge.

In the early morning hours of December 14, 1958, Jang Gow was brutally beaten in his combination restaurant-home. As a result of his injuries, he died December 28, 1958, without ever regaining full consciousness.

More than two years later, petitioners Albert George Proque, Johnny James Williams, and Roosevelt Washington were arrested on charges of "suspicion of homicide." During the course of their subsequent trial for the murder of Jang Gow, petitioners moved to exclude from evidence certain statements elicited while they were in the custody of the police. Petitioners claimed that these statements had not been voluntarily made, and that their use against them

at the trial would deny them due process of law, as guaranteed by the Fourteenth Amendment to the Constitution.

Relative to the issue of voluntariness, evidence was taken by the court outside of the jury's presence, and the motion was overruled.[1] The question of voluntariness was then presented to the jury, which, by its general verdict of guilty resolved the question against petitioners. Motions in arrest of judgment and for new trial were overruled, and the trial judge sentenced petitioners to death by electrocution. On appeal, the Louisiana Supreme Court reviewed the record and affirmed the conviction.[2] The Governor of Louisiana has never signed a warrant for their execution.

Petitioners, having been denied writs of habeas corpus in State Court, filed writs of habeas corpus in the Eastern District of Louisiana on December 5, 1966. The matter was then transferred to this court pursuant to the provisions of 28 U.S.C. § 2241, as amended by Public Law 89–590 of the 89th Congress. Since the parties stipulated that the State Court record contained all of the relevant facts and that they chose to rely solely upon that evidence, no evidentiary hearing was held in this court.[3] Extensive briefs were filed, however.

The question for our determination is whether, considering the "totality of the circumstances," [4] petitioners' statements were involuntary and should have been excluded. In order to reach a decision on this point, we need go no further than the State's version of the facts. However, petitioners' claims of physical abuse and coercion will be summarized to indicate the conflicting testimony surrounding the custodial interrogations.

The trial of this case was prior to the date of decision of Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the requirements of which, therefore, are not directly applicable, Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966), although relevant on the issue of voluntariness, Davis v. State of North Carolina, 384 U.S. 737, 86 S.Ct. 1761 (1966).

The arresting officer, and the State's chief witness, Sgt. R. L. Roberson, evidently was the person most closely associated with petitioners during the interrogation. The testimony of the other police officers was mainly corroborative of his testimony. Thus the following narrative of facts represents the gist of the State's version of the facts, and Sgt. Roberson's testimony.

Petitioners were taken into custody on March 17, 1961.[5] Washington was questioned briefly about his employment and asked to return the next morning at ten o'clock.[6] Progue and Williams were unofficially booked on "suspicion of homicide" when taken into custody, as was Washington when he returned voluntarily on March 18.[7] None of the petitioners were brought before a committing

---

1. The trial judge's opinion on voluntariness is set forth at pages 674–677 of the State transcript. All further references to transcript page numbers will be to the numbers of the State transcript.

2. State v. Progue, 243 La. 337, 144 So.2d 352 (1962).

3. Townsend v. Sain, 372 U.S. 293, 322, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963).

4. Fikes v. State of Alabama, 352 U.S. 191, 197, 77 S.Ct. 281, 1 L.Ed.2d 246 (1957). See also, e.g., Clewis v. State of Texas, 386 U.S. 707, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967); Davis v. State of North Carolina, 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966); Haynes v. State of Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963).

5. Transcript, 271–273. Although there is some evidence to indicate that it was in fact March 16, the preponderance of the evidence supports the conclusion that it was March 17.

6. Transcript, 273, 316.

7. Transcript, 354. There is, of course, no statutory authority in Louisiana for the arrest of a person for "suspicion of homicide." If there had been reasonable cause to justify an arrest for murder, it seems petitioners would have been booked for murder, rather than "suspicion of homicide."

magistrate "without unnecessary delay" as required by La.R.S. 15:79–80 (1950).[8] After petitioners had been taken into custody, they were placed in separate cells to prevent communication between them[9] and were not allowed to have visitors until they made statements.[10]

Washington, when first questioned at 10:00 a. m. on March 18, spoke of a conversation he had overheard between Progue and Williams[11] and signed a typewritten statement to that effect.[12] When questioned later that afternoon, he signed another statement relating to a different conversation.[13] Williams was first questioned at 2:00 p. m. on March 18 for approximately an hour, but would make no statement.[14] Progue was interrogated on March 18 for four hours, between 8:00 p. m. and midnight.[15] Although he was initially questioned about general matters and another unsolved murder in Shreveport, during the late evening hours he was told that he was being investigated in connection with the Gow killing.[16] He steadfastly denied any part in the murder.

Williams was again questioned on March 19 and 20, for about an hour each day, but still refused to make a statement.[17] Washington was questioned in the early morning hours of March 20, but made no incriminating statements.[18]

On the morning of March 21, Williams and Washington were driven to Baton Rouge, approximately 235 miles away, where they were questioned by State Police and took lie detector tests.[19] While in Baton Rouge, Williams and Washington were held in East Baton Rouge Parish Jail. They were returned to the city jail in Shreveport on the afternoon of March 24.[20]

On March 25 and 26, both Williams and Washington were interrogated, but made no statements.[21] Washington underwent further fruitless interrogation on March 27.[22] Both of them were again questioned on March 29, and still refused to make statements.[23]

While being questioned on March 30, Washington orally implicated all of the petitioners in the murder of Jang Gow.[24] One of the interrogators, Lt. Pynes, testified that immediately prior to Washington's statement, "I told him it would be in his best interest to make a statement."[25] The statement was recorded at 9:20 p. m. on March 30.[26]

After receiving and recording Washington's statement, the police then began

---

8. La.R.S. 15:79–80 (1950): "When a peace officer shall have made an arrest with a warrant, he shall, after the prisoner shall have been booked, bring him, without unnecessary delay, before the judge designated in the warrant.

"When any person shall have been arrested without a warrant, the peace officer, after he shall have caused him to be booked, shall bring him, without unnecessary delay, if the charge be such as to entitle the accused to a preliminary examination, before the judge having authority to sit as a committing magistrate in the case, otherwise, before the judge having trial jurisdiction thereof."

Sections 79–80 were replaced when the Louisiana Code of Criminal Procedure became effective January 1, 1967. Cf. Articles 228, 229, 230, Louisiana Code of Criminal Procedure (1967).

9. Transcript, 452, 473.

10. Transcript, 377, 456, 984.

11. The statement implicated none of the petitioners in the Gow murder.

12. Transcript, 317–318.

13. Transcript, 318. This statement, too, implicated no one.

14. Transcript, 300, 355.

15. Transcript, 274, 282, 335.

16. Transcript, 282, 335.

17. Transcript, 300, 355–356.

18. Transcript, 320.

19. Transcript, 301–305, 321.

20. Transcript, 305.

21. Transcript, 306–307, 322–323.

22. Transcript, 324.

23. Transcript, 325, 360.

24. Transcript, 326, 407.

25. Transcript, 973.

26. Transcript, 326.

interrogating Williams, telling him that Washington had implicated him, but Williams still refused to make a statement.[27] The police then took Washington home to recover some clothes that he supposedly wore on the night of the murder. When Washington told them that Williams had been wearing a particular type of coat on that night, the police returned to the jail and took Williams to his brother's house, where he recovered the coat.[28]

Progue, who had not been questioned since March 18, was questioned for about an hour between 11:00 p. m. and 1:00 a. m. after the police had recovered the clothing belonging to Williams and Washington.[29] He was told that one of his co-defendants had made a statement, blaming him for the actual murder.[30] When Progue still refused to confess, the police returned to Williams' cell and interrogated him without results.[31] At approximately 2:00 a. m., Progue was again questioned to no avail.[32]

Williams made his first statement about 10:00 a. m. March 31, and this statement was then recorded.[33] On the afternoon of the thirty-first, Williams and Washington were taken to the scene of the crime where they re-enacted the crime before the Public Service Commissioner, Police Chief, District Attorney, Sgt. Roberson, Lt. Pynes and representatives of the news media.[34]

That same afternoon, Progue was again questioned by the police, but he still maintained he had nothing to do with the crime.[35] On April 1, all of the petitioners were again questioned, and Washington identified a pistol he said Progue used to murder Gow.[36] When Progue was questioned on April 1, he was again told that Williams and Washington had signed statements, re-enacted the crime and were blaming the murder on him.[37]

Actually, Washington and Williams signed typewritten statements on April 2.[38] The testimony of Lt. Pynes indicates how these signed statements were used in the interrogation of Progue after they were procured:

"Well, sir, at that particular time we had gotten statements from Melvin Dixon and Roosevelt Young on the pistol—Herbert Young, and we had typed up the statements that Williams and Washington had made, and we did not allow him to read the statements. However, we showed him that we did have statements from them, and that they showed that he was lying, and that he had best tell us about the thing. And he made several excuses as to where they would be trying to involve him in the thing, and so forth. And we explained to him at that time that so long as he refused to talk about the thing that we had no alternative except to try to check his alibi and that he would have to remain in jail. And we took him back to his cell." [39]

During further interrogation on April 3, Progue asked to speak to his mother and wife, but that request was refused.[40] However, ostensibly to "give Mrs. Progue a place to sleep," the police took her into custody on April 3 and placed her in a cell in the female section of the same jail in which Progue was incarcerated.[41] Mrs. Progue, who had four small children at home, was expecting her fifth child in two months.

27. Transcript, 308.
28. Transcript, 308.
29. Transcript, 275, 308, 283–284.
30. Transcript, 283–284.
31. Transcript, 308.
32. Transcript, 336.
33. Transcript, 310, 361, 415.
34. Transcript, 312, 328, 417.

35. Transcript, 277, 287, 336.
36. Transcript, 278, 287, 313, 330, 340.
37. Transcript, 287, 340.
38. Transcript, 313, 331, 420, 428.
39. Transcript, 433.
40. Transcript, 435.
41. Transcript, 436.

After being told of his wife's incarceration, Progue made an incriminating statement later in the evening of April 3.[42] After this confession, Progue was allowed to visit with his wife and family, and his wife was released from jail.[43]

The facts above related are, of course, admitted by the State. The State denies the use of either physical or mental abuse, threats or promises, and asserts that the confessions were freely and voluntarily given.

Petitioners, however, contend that they were subjected to physical abuse and threats,[44] which we will not detail because these contentions are unnecessary to our decision. Petitioners also assert that they were promised by the police that if they co-operated and signed confessions, the District Attorney would be lenient and they would receive no more than a two or three-year sentence.[45] When questioned about why he had confessed after eighteen days of denying any part in the Jang Gow murder, Progue testified as follows:

> " * * * they went and picked my wife up, and then they went and come got me. And I come upstairs to the investigation room up there. They were bringing my wife out, and they carried me in.
>
> "They said, 'We have got your wife up here * * * I am going to lock your wife up on a One Thousand Dollar material witness bond * * * You know nobody ain't going to get her out of jail, don't you?'
>
> "I said, 'Yes, sir, I know that.'
>
> "He said, 'She will stay there till you go to trial * * * You will go to trial sometime over in next year. It will be in '62 * * * You are going to stay right here in the straight jacket * * * I don't have nothing to do. This is my job * * * I can question you as many hours as necessary. Don't make no difference. I don't care whether you sleep or not. That is all I am going to do, is sit here and question you.'
>
> "I told him, 'Sergeant, I don't think that is right for you to lock my wife up in jail away from my family * * We have four kids * * * The oldest one is not but nine years old * * * Well, if I sign a statement * * * will you let my wife go out of jail?'
>
> "He said, 'If you make a statement * * * I will let your wife go out of jail * * * I guess you are going to make one.'
>
> "I say, 'I am not going to lie on myself * * * You will just have to lock her up and me, too.'
>
> "And he told me, said, 'Progue * * You better put some kind of lie on this paper, whether it is the truth or ain't the truth, because, Boy, you are going to burn,' like that.
>
> "But, I sat about thirty minutes. I was thinking about my wife. I said, 'Well, I will make a statement if you are going to lock my wife up * * ' "[46]

Turning now to a consideration of the authorities upon which we must base our decision, we note that in Clewis v. State of Texas, 386 U.S. 707, 87 S.Ct. 1338

---

42. Transcript, 338, 343, 436. During the first part of Sgt. Roberson's testimony (Transcript, 279), he said that Progue's first confession was on April 2, but he later changed that date to April 3, and this is the date also given by Lt. Pynes.

43. Transcript, 437.

44. For Williams' testimony, see Transcript, 547, 549, 552, 564, 1000, 1004, 1010, 1015, 1039, 1044, 1048, 1049. For Washington's testimony, see Transcript, 572, 1069–1075. For Progue's testimony, see Transcript, 592–594, 596–598, 603–605.

45. For Williams' testimony, see Transcript, 550, 561, 563–564, 1008, 1019. For Washington's testimony, see Transcript, 1069–1075. For Progue's testimony, see Transcript, 598, 608–609.

46. Transcript, 603–604. For purposes of clarification, the paragraph form was supplied to set forth Progue's testimony. For further testimony by Progue on this matter, see Transcript, 605, 610, 624–625, 629, 632, 634.

(1967), Clewis' conviction at his pre-Miranda trial was reversed because of the involuntariness of a statement introduced in evidence. The Supreme Court concluded that the following factors required a determination that the confession was involuntary. Clewis, a Negro with only a fifth-grade education, had never been fully advised of his right to counsel, had been held thirty-eight hours before being taken before a magistrate to be charged as required by Texas law, and the intermittent interrogation for approximately ten days was specifically designed to elicit a signed statement.

In Davis v. State of North Carolina, 384 U.S. 737, 86 S.Ct. 1761 (1966), a Negro of low mentality was taken into custody and kept in a detention cell for sixteen days, where he spoke to no one but the police, who interrogated him intermittently each day. Finding that Davis had never been advised of his right to remain silent or to counsel during this sixteen days, his confession was ruled involuntary. The following language was used by the Court:

> "The facts established on the record demonstrate that Davis went through a prolonged period in which substantial coercive influences were brought to bear upon him to extort the confessions that marked the culmination of police efforts. Evidence of extended interrogation in such a coercive atmosphere has often resulted in a finding of involuntariness by this Court. E. g., Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961); Fikes v. State of Alabama, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246 (1957); Turner v. Commonwealth of Pennsylvania, 338 U.S. 62, 69 S.Ct. 1352, 93 L.Ed. 1810 (1949). We have never sustained the use of a confession obtained after such a lengthy period of detention and interrogation as was involved in this case." [47]

In light of *Clewis* and *Davis*, and the authorities cited therein, we conclude that the statements introduced at petitioners' trial were involuntary and should have been excluded. This conclusion is reached without considering the claims by petitioners of physical abuse, threats and promises. We consider only the State's version of the facts.

■ The State admits that petitioners were taken into custody on March 17 and incarcerated without being charged or brought before a committing magistrate as required by La.R.S. 15:79–80 (1950).[48] Although they were unofficially booked on "suspicion of homicide," there is no such crime in Louisiana. The truth of the matter is that there was an unsolved two-year-old murder for which petitioners were incarcerated for investigation and interrogation. There is nothing in the record to support the assumption that there existed any more evidence than a rumor to connect petitioners with the crime—certainly much less than "reasonable cause" required for a warrantless arrest under Louisiana law.[49] It seems quite clear, therefore, that petitioners were illegally arrested and detained when they were taken into custody on March 17 and unofficially booked on "suspicion of homicide."

■ During the lengthy period of custodial interrogation, petitioners were never advised of their right to consult with counsel. Admittedly, until petitioners confessed to the murder of Jang Gow, they had never been officially charged or booked with the commission of any crime, and they were neither allowed to have visitors or make telephone calls. It was only after thirteen days of intermittent interrogation that Washington made an incriminating statement. With Williams, it was after fifteen days, and Progue, after eighteen days.

The circumstances surrounding the incarceration of Progue's wife and his

---

47. 384 U.S. 737, 752, 86 S.Ct. 1761, 1770 (1966).

48. See Note 8, supra.

49. Article 213, Louisiana Code of Criminal Procedure (1967).
   Cf. La.R.S. 15:60 (1950), the statutory provision effective at the time petitioners were taken into custody.

subsequent confession are indeed suspicious. The police admittedly placed her in jail on April 3, explaining that it was necessary in order to give her a place to sleep.[50] The fact that Progue, after consistently denying any knowledge of the crime for eighteen days, confessed soon after his wife was incarcerated certainly compels the conclusion that she was jailed to pressure Progue into implicating himself.

Undoubtedly, therefore, the statements elicited during the extended period of custodial interrogation were involuntary. The introduction of those statements at petitioners' trial deprived them of due process of law, as guaranteed by the Fourteenth Amendment. The decisions cited by the State we consider to be either inapplicable to these facts or impliedly overruled by subsequent decisions of the United States Supreme Court.

Therefore, under compulsion of the Supreme Court decisions cited above, the writs of habeas corpus must be granted, but the State of Louisiana shall retain the right to retry petitioners within six months from the finality of this ruling. Consistent with retention of that right, the State has the additional right to keep petitioners in custody pending retrial.