204 So.2d 490

**Louis James DAVIS**

v.

**STATE.**

**I Div. 119.**

Court of Appeals of Alabama.

Nov. 21, 1967.

MacDonald Gallion, Atty. Gen., and Paul T. Gish, Jr., Asst. Atty. Gen., for the State.

Oliver J. Latour, Jr., Mobile, for appellant. .

JOHNSON, Judge.

Appellant was convicted of the offense of grand larceny in Mobile County, Alabama, and sentenced on September 20, 1961, to a term in the State penitentiary as punishment therefor. On June 7, 1965, his petition for writ of error coram nobis was granted and the first judgment of conviction was set aside. Appellant was then indicted by the Mobile County Grand Jury for the offense of robbery. Upon a plea of not guilty, trial was had and appellant was convicted and sentenced to a term of ten years in the State penitentiary. From this judgment, he makes this appeal.

Tamar Robinson of Mobile County, Alabama testified that he was robbed by two men in April, 1961, on his way home from the Jolly Spot Night Club. He testified that he had been on a "little outing"; that he knew appellant but did not see him the night prior to the robbery; that when he left the night club he was attacked from behind by two men, one of whom "put a knife around" his neck while the other

took approximately $3.00 in coins from his wallet. Robinson stated that he turned and saw them running away and recognized appellant by "his shape and shadow". He obtained the money and wallet from the Mobile Police Department, neither of which was introduced into evidence.

Robinson stated on cross-examination that he could not recall the amount of beer he had drunk on the night he was robbed between 7:00 P.M. and midnight, but that he was not drunk as the next day was a "working day". He said that there were no lights around at the time of the robbery; that he did not see the knife; could not describe it; and did not know which of the two men had it. Robinson testified that when he saw the men running away, they were "running off pretty good"; that they were approximately the length of the courtroom away from him; and that he attempted to telephone the police from the house of a neighbor whose name he could not remember but no one answered the door. He stated that he eventually met a police scout car and told the officer he had been robbed; but was unable to describe the robbers except as being colored, though he said he knew appellant was one of them by "the back of his head—and I knew the shape of him."

Officer Huey of the Mobile Police Department testified that he received the complaint from Robinson the night of the incident and that Robinson appeared nervous and upset and could only say that the men were tall. Officer Huey stated that Robinson appeared sober, steady, clear of speech and that he detected no odor of alcohol on him.

Detective Rigby of the Prichard Police Department testified that he was one of the officers who arrested appellant and Felix Coleman at "around 1:00 or 1:30" A.M. on April 22, 1961, about six or seven blocks from the Jolly Spot Club. He stated that he first saw appellant and the other man "walking real fast"; that he arrested them knowing nothing about the robbery

of Robinson; and that he arrested them because one of them dropped "a pretty good sized knife", but he does not know whether this was appellant or not.

Detective Rigby searched the two and found that one had a mask made of a sweat shirt sleeve and the other had a towel with holes cut in it and a safety pin. He could not say who had which mask. He also testified that one of the two had what appeared to be a pool stick when stopped and that there were dogs in the neighborhood. Rigby took them to the docket room of the Prichard Police Headquarters and turned them over to the lieutenant. He described the knife in question as being a black handled push button knife (an automatic). He could not say which of the two parties "flipped" the knife at his approach.

Lieutenant Jack Clark of the Mobile Police Department testified that he interrogated appellant. His testimony was in part as follows:

"Q. Was he [appellant] transported to Mobile on the 27th?

"A. The 27th, that's right.

"Q. 27th of April, and when was the first time you saw him?

"A. As I told you before on the 27th or 28th, I'm not sure which,—whether it was that day or the next, but shortly after he came to the station.

"Q. O. K.,—did you talk to him at that time?

"A. Yes, sir.

"Q. Did you have an arrest—you say you had a 'hold' on him,—what exactly was—

"A. A detainer, investigation for[1] robbery.

"Q. Investigation for robbery?

"A. Right.

"Q. What exactly is a 'hold'?

"A. Well, a 'hold' in this particular case refers to them having admitted to the Prichard Police Department that they had robbed an old man in the Mobile jurisdiction; and that particular night we had a robbery of an old man near the Bullshead area; in fact, where this one has been described. We had that, so we placed a detainer until— Prichard had some other robberies they were investigating him on, and until they released him to us, they were interviewing him on some of their robberies, or muggings, or rape, or what not. They detained him possibly a week before they released him to us."

Lt. Clark further stated that appellant and Coleman were placed in the Mobile City Jail but said that he did not personally place them under arrest. This testimony was in part as follows:

"Q. You didn't arrest them for robbery until they were identified by the complainant?

"A. That's right.

"Q. Did you have them under arrest when you brought them to Mobile?

"A. They were under arrest for investigation, yes.

"Q. They were under arrest for investigation—

"A. Of robbery, yes sir.

"Q. Did you have a warrant?

"A. No warrant for investigation, no sir.

"Q. Had you gone before a magistrate asking for a warrant?

"A. At that time, no sir.

"Q. Did you have any information— did the Mobile Police Department have any information that it had gathered on its own with regard to whether or not this defendant was implicated in that robbery out in the Bullshead area?

"A. That it had gathered on its own? —Repeat that question?

"Q. O. K. Did the Mobile Police Department have any information that it had gathered on its own,—by that I am attempting to exclude any information you got from the Prichard Police Department, as to who committed this particular robbery?

"A. Yes sir.

"Q. What information did you have?

"A. Well, Prichard had them, and we located the old man,—it was a couple of days after it happened, this Robinson, the Complainant, and he told us that the boy,—one of the boys,—he knew one of the boys, and he had worked with him. He believed his name was Davis, he didn't know Davis what, not enough to arrest him and we already knew that one of them was Davis that they had in Prichard, but we didn't know whether it was the same one until after he come back to Mobile. We had a pretty good idea, but we didn't know, and we didn't obtain a warrant until we were sure.

"Q. Why didn't you obtain a warrant —did you have an opportunity to obtain a warrant?

"A. No,—we had a little trouble finding the complainant, for one thing, after we got the subjects back to the jail."

Lt. Clark further stated that the mask which he had obtained from the Prichard police was shown to appellant and that a Prichard police officer, whose name he was not sure of, had called and told him (Clark) that "they had admitted it". Clark stated that appellant admitted the crime the first time he was interrogated by the Mobile police. He testified that there were no threats or promises made to appellant in his (Clark's) presence, and that appellant's statement was reduced to writing, read back to him, and signed by appellant.

Appellant objected to the admission of his statement, Exhibit No. 1, on the grounds

that he had not been advised at the time of interrogation of his right to counsel; that he was shown documents and articles which were obtained by an illegal search and seizure; that he had been held in the Prichard jail for seven days without counsel; and that there was no warrant for this arrest in Mobile. These objections were overruled.

On cross-examination, Lt. Clark stated that appellant did not ask him if he could make any calls; that he told appellant he had a right to remain silent and not to say anything at all but did not tell him he had a right to remain silent during subsequent interrogations after he confessed.

After appellant's motion to exclude the evidence was denied, Felix Coleman testified that he and appellant went to the Jolly Spot Club and that he stayed outside while appellant went inside; that he saw Robinson come out of the club and he was drunk; that there were several boys outside the club who were "horse playing" with Robinson and a boy named Sonny took Robinson's billfold without Robinson's knowledge. The witness stated that Sonny threw the wallet away and he (Coleman) picked it up.

When appellant came out of the club a few minutes later, they walked toward Highway 45 when stopped by the police. Coleman stated that the police asked for the stick he was carrying, and put both boys in the car upon finding out Coleman's name. At the Prichard jail the police took the wallet from Coleman and interrogated them together. He further testified that he was "whipped a little" with a hose pipe, a belt, and the fists of an officer. He stated that he asked to make a telephone call but "wasn't allowed to see nobody". Coleman stated that he was beaten each night he was in the Prichard jail "with a green hose pipe"; that he was beaten by Mobile police with his own pool stick. He further testified that he pled guilty to petty larceny and he is now serving his one year sentence therefor in the Mobile jail.

Appellant testified that he did not see Robinson in the night club but passed him going out as he went into the club. He stated that the police stopped them on the way home and they were arrested without being told why. Appellant stated that they were interrogated about various other crimes, and when they did not confess they were separately beaten. Appellant stated that he was not allowed to make a telephone call, and when his grandmother came to the jail to see him the police said he wasn't there.

Appellant testified that he was never told of his right to counsel and that the first time he "heard of any rights" was at the penitentiary.

It is appellant's contention that the alleged confession was involuntary and, therefore, inadmissible as evidence against him. Also that said confession was brought about because of articles illegally taken from him and then shown to him to induce his statements, thus creating a situation, according to the contention of appellant, where the statement was "fruit of a poisonous tree."

Claims of Error Nos. 2 and 4 also deal with testimony of Lt. Clark of Mobile concerning the first (or Prichard) confession of appellant. These claims of error relate to the voluntariness of the confession or the manner in which it was obtained.

A doctrine known as the "fruit of the poisonous tree" doctrine has grown into the law. Justice Lawson has completely dealt with this doctrine in Duncan v. State, 278 Ala. 145, 176 So.2d 840. This opinion states in part as follows:

"In essence, that doctrine ['so called "fruit of the poisonous tree"'] is to the effect that an unlawful search taints not only evidence obtained at the search, but *facts discovered* by a process initiated by the unlawful search. Fahy v. State of Connecticut, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171; Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441; Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319; United States v. Paroutian, 2 Cir., 299 F.

· 2d 486; United States v. Avila, D.C., 227 F.Supp. 3." (Emphasis ours.)

This doctrine has also been applied to statements. Duncan v. State, supra; Wong Sun v. United States, supra; See also Carpenter v. State, 42 Ala.App. 618, 174 So.2d 336.

In relating this doctrine to the case at bar, we must first consider the initial arrest of appellant. The Prichard police admitted that appellant was arrested at a time when the officers had no knowledge of the alleged robbery in question. It was also admitted that there was no warrant for appellant. Lt. Clark of the Mobile Police Department stated that he had only a "detainer, investigation for robbery", a "hold", and did not actually arrest appellant until identified by Robinson; that no warrant for investigation was had by the Mobile Police Department and no magistrate seen; but that appellant and Coleman were "under arrest for investigation".

The Code of Alabama, 1940, Tit. 15, Sec. 154, states in part as follows:

"* * * or when he has reasonable cause to believe that the person arrested has committed a felony, although it may afterwards appear that a felony had not in fact been committed * * *"

No notice of a felony having been committed had been received by the arresting officer at the time of the arrest of this appellant. The arresting officer stated that he stopped appellant because he saw him "flip" a knife, which was "large" and about "10 or 11 inches long". Although this description of the knife would seemingly cause it to fall within the purview of Brewer v. State, 113 Ala. 106, 21 So. 355, and Sears v. State, 33 Ala. 347, there was no affirmative showing by the State that the knife was in fact concealed as required by Code of Alabama, 1940, Tit. 14, Sec. 161. This, then, was the only cause given for the arrest of appellant and Coleman and the only reason given for their being incarcerated in the Prichard jail for about a week before being

turned over to the Mobile Police. The record discloses no placing of appellant before a magistrate in Prichard and no formal arrest of him as required by Tit. 15, Sec. 160, Code of Alabama, 1940.

If the arrest was not in fact a legal arrest, then anything taken from appellant would be illegally obtained evidence and, therefore, inadmissible against him.

"When a police officer arrests without a warrant, and the defendant objects to the introduction of evidence claimed to be incident to such an arrest, the burden is on the State to show that the arrest was lawful." Knox v. State, 42 Ala.App. 578, 172 So.2d 787; Duncan v. State, supra.

See also Wilson v. State, 43 Ala.App. 596, 197 So.2d 283.

Lt. Clark testified that he confronted appellant and his co-defendant while interrogating appellant, and that appellant subsequently confessed. At no time did the State show that the arrest was lawful. The State apparently relied upon the theory of "reasonable cause to believe" appellant may have committed a felony. Code of Alabama, 1940, Tit. 15, Sec. 154. Although evidence was introduced tending to show that other felonies had been committed in the Prichard area, viz. the questioning of appellant about entirely unrelated offenses before the alleged confession, it is the opinion of this court that there was not sufficient probable cause to believe appellant had committed a felony at the time of his arrest.

Appellant claims that he was not informed by the officers of his right to remain silent. Lt. Clark stated in his testimony that he advised appellant of this right, though not after the first occasion. If Lt. Clark failed to inform appellant of his rights at each interrogation, then this is a violation of appellant's right to remain silent. Gideon v. Wainright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799; Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977.

Before Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, the fact that a prisoner confessed while illegally detained was not by itself alone ground to reverse a state court conviction.

Coleman, J., wrote in Loyd v. State, 279 Ala. 447, 186 So.2d 731:

"We are not advised of any case holding that a confession is inadmissible for the reason that it was made while a defendant was being held after being unlawfully arrested. As we note hereafter, the Supreme Court of the United States has held that evidence obtained as the result of an illegal search is not admissible, but we are not advised that the rule of exclusion has been applied to a confession, which is shown to have been voluntarily made, although the confessing person may have been illegally arrested * * *".

However, here, in addition to appellant's rather extended imprisonment before confessing, we have a number of other coercive factors. We list the following:

a) At the time of his arrest, appellant was seventeen years old.

b) He was only booked by the Prichard police on a charge of "hold for investigation".

c) He was held in Prichard City Jail for five days during which time a State witness stated that he confessed.

d) On release from the Prichard custody, appellant was delivered to the Mobile police and was kept in the city jail for seven days.

e) Appellant was booked in Mobile on a charge of "investigation of robbery"; the complaining witness had not been asked to sign a "John Doe" complaint.

f) During these seven days he twice confessed.

g) At no time either in Prichard or Mobile during the detention was appellant brought before a committing magistrate.

h) No cautions, warnings or advice as to rights to see friends, family, counsel or just remain silent are shown.

In somewhat analogous circumstances in a Federal habeas corpus proceeding, Progue v. Middlebrook, D.C., 271 F.Supp. 176, Chief Judge Dawkins stated:

" * * * in Clewis v. State of Texas, 386 U.S. 707, 87 S.Ct. 1338 [18 L.Ed.2d 423] (1967), Clewis' conviction at his pre-Miranda trial was reversed because of the involuntariness of a statement introduced in evidence. The Supreme Court concluded that the following factors required a determination that the confession was involuntary. Clewis, a Negro with only a fifth-grade education, had never been fully advised of his right to counsel, had been held thirty-eight hours before being taken before a magistrate to be charged as required by Texas law, and the intermittent interrogation for approximately ten days was specifically designed to elicit a signed statement.

"In Davis v. State of North Carolina, 384 U.S. 737, 86 S.Ct. 1761 [16 L.Ed.2d 895] (1966), a Negro of low mentality was taken into custody and kept in a detention cell for sixteen days, where he spoke to no one but the police, who interrogated him intermittently each day. Finding that Davis had never been advised of his right to remain silent or to counsel during this sixteen days, his confession was ruled involuntary. The following language was used by the Court:

" 'The facts established on the record demonstrate that Davis went through a prolonged period in which substantial coercive influences were brought to bear upon him to extort the confessions that marked the culmination of police efforts. Evidence of extended interrogation in such a coercive atmosphere has often resulted in a finding of involuntariness by this Court. E. g., Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961); Fikes v. State of Alabama, 352 U.S.

## 152

191, 77 S.Ct. 281, 1 L.Ed.2d 246 (1957); Turner v. Commonwealth of Pennsylvania, 338 U.S. 62, 69 S.Ct. 1352, 93 L. Ed. 1810 (1949). We have never sustained the use of a confession obtained after such a lengthy period of detention and interrogation as was involved in this case.'

"In light of Clewis and Davis, and the authorities cited therein, we conclude that the statements introduced at petitioners' trial were involuntary and should have been excluded. This conclusion is reached without considering the claims by petitioners of physical abuse, threats and promises. We consider only the State's version of the facts.

"The State admits that petitioners were taken into custody on March 17 and incarcerated without being charged or brought before a committing magistrate as required by La.R.S. 15:79–80 (1950). Although they were unofficially booked on 'suspicion of homicide,' there is no such crime in Louisiana. The truth of the matter is that there was an unsolved two-year-old murder for which petitioners were incarcerated for investigation and interrogation. There is nothing in the record to support the assumption that there existed any more evidence than a rumor to connect petitioners with the crime—certainly much less than 'reasonable cause' required for a warrantless arrest under Louisiana law. It seems quite clear, therefore, that petitioners were illegally arrested and detained when they were taken into custody on March 17 and unofficially booked on 'suspicion of homicide.'

"During the lengthy period of custodial interrogation, petitioners were never advised of their right to consult with counsel. Admittedly until petitioners confessed to the murder of Jang Gow, they had never been officially charged or booked with the commission of any crime, and they were neither allowed to have visitors or make telephone calls. It was only af-

ter thirteen days of intermittent interrogation that Washington made an incriminating statement. With Williams, it was after fifteen days, and Progue, after eighteen days."

 Careful consideration under the "totality of circumstances" rule requires us to hold that the prosecution failed as a matter of law to overcome the presumption that the confessions were involuntary. See Harris v. State, 280 Ala. 468, 195 So.2d 521 (headnote 9).

The judgment of the circuit court is due to be reversed and the cause there remanded for new trial.

Reversed and remanded.