265 So.2d 164

**Lee Henry DOTSON**

v.

**STATE.**

**1 Div. 116.**

Court of Criminal Appeals of Alabama.

April 4, 1972.

Rehearing Denied May 9, 1972.

AFTER REMANDMENT BY THE SUPREME COURT OF ALABAMA

ALMON, Judge.

Dotson was arrested on the afternoon of October 18, 1969. At that time he appeared to be intoxicated and for this reason was not questioned until the following day about noon. He began answering questions after Detective Chambers had given him the *Miranda* warnings. During the questioning the following occurred:

"Q. You say tha gun went off. How did this happen?

"A. I would like to wait to answer this until I talk to my lawyer."

After Dotson indicated that he did not want to answer questions regarding how the gun went off, Detective Chambers did not further question him on that subject. Thus, there is no indication from the record that there was any coercive action on the part of the police.

Implicit in his answer is the fact that he understood he had a right to refuse to answer questions until he talked to a lawyer if he so chose. That he had the presence of mind to selectively refuse to answer certain questions until he had talked to a lawyer strongly supports the conclusion that Dotson understood the warnings and voluntarily relinquished his rights to the questions which he chose to answer. By refusing to answer the above question he was in fact exercising the very right in question on this appeal.

Furthermore, at no time during trial did he contend that his statements were involuntary or that he failed to waive his right to counsel. This identical question was before the Court in United States v. Hayes, 385 F.2d 375 (4 Cir., 1967); cert. denied 390 U.S. 1006, 88 S.Ct. 1250, 20 L.Ed.2d 106, where the following observation was made:

". . . Moreover, it is noteworthy that at no stage in the proceedings has the appellant ever denied that he understood the warnings given him, and while a defendant does not have the obligation to testify himself or to offer testimony, a court cannot supply evidence that is lacking . . . ."

Thus, there is no evidence whatsoever in the record to indicate that Dotson failed to understand and to waive his right to counsel. On the contrary, the manner in which he answered questions indicates that he did waive his right to counsel and his privilege against self-incrimination.

After further consideration we consider the judgment of conviction should be affirmed. For a more complete statement of the facts see Judge Cates' dissenting opinion.

Affirmed.

PRICE, P. J., and TYSON, J., concur.

CATES, Judge (dissenting):

In addition to what was said on original deliverance I set out the *entire* (except as noted) evidence as to Dotson's confessing including the question and answer confession. This evidence came into the case through the testimony of the witness, Doyle W. Chambers, a detective employed as a deputy sheriff. The pertinent testimony (R. 43–47) was as follows:

"MR. PFLEGER: After you saw him that first time, did you see him again later?

A   The following day about 12:00 o'clock.

Q   And at that time and place that you saw him, Mr. Chambers, where was he?

A   In my office in the Detective Division of the Sheriff's Office.

Q   And when you saw him in your office in the Detective Division of the Sheriff's Office the following day, did you advise him of anything?

A   I advised him of his legal rights.

Q   Now, what did you—

MR. SEALE: Just a minute. I move to exclude the statement, 'I advised him of his legal rights.'

THE COURT: That's a conclusion; grant the motion.

MR. PFLEGER: What did you advise him of, Mr. Chambers?

A   I advised him as follows: That—

MR. SEALE: Now, we object to his reading—

WITNESS: I wasn't reading, sir.

THE COURT: He wasn't reading, I don't think.

WITNESS: I was just looking at my hands.

MR. SEALE: We always assume against them.

THE COURT: Tell us what you told the defendant.

WITNESS: That he has the right to remain silent; that anything he says can and will be used against him in a Court of law; that he has a right to talk to a lawyer and have him present while he is being questioned; *that if he cannot afford a lawyer, one will be appointed and paid for by the Court*; that he has a right to refuse to answer questions until he has gotten himself a lawyer. .

MR. PFLEGER: After advising him that, did you offer him any reward or any hope of reward or any inducement to get him to make that statement?

A  I did not.

Q  Did you use any force, duress or coercion of any nature to get him to make a statement?

A  No, sir.

Q  Did anyone in your presence or hearing offer him any reward or hope reward or any inducement to get him to make a statement?

A  No, sir.

Q  Did anyone in your presence or hearing use any force, duress or coercion of any nature to get him to make a statement?

A  No, sir, they did not.

Q  Did he make a statement?

A  He did, sir.

Q  Was it reduced to writing?

A  Yes, sir.

Q  And who handled that, please, sir?

A  I did.

Q  Do you have it with you?

A  Yes, sir. It's in my file right there— the yellow pages.

Q  (Handed witness file from counsel table) Would you take the statement off from any other papers, please, sir?

A  Yes, sir.

MR. SEALE: Mr. Pfleger, if you are going to use it, if the Judge let's it in, don't you have some typewritten copies that can be substituted?

MR. PFLEGER: I think so. I'll ask you, Mr. Chambers, to look at this three pages of paper that has a bunch of typing on it. Can you tell me what that is, please, sir?

A  Yes, sir. That is the statement that I took from Lee Henry Dotson.

Q  Is that the typewritten statement after it was written down in longhand?

A  Yes, sir. It was reduced to typing from our original longhand copy.

Q  And was that signed in your presence?

A  It was.

Q  By whom?

A  Lee Henry Dotson.

Q  And who else was present at the time?

A  Detective Manning witnessed the statement in its entirety, and signed it as a witness.

Q  But this typewritten copy doesn't show that anybody witnessed it, does it?

Q  But you and Mr. Manning witnessed it, and Detective Joe Hutchisson, is that correct?

A  Yes, sir.

MR. PFLEGER: If the Court please, if the defense has no objection, I would offer the copy in evidence.

MR. SEALE: I don't raise the objection on the ground that this is a typewritten copy; *but that there's been no proper predicate laid.*

THE COURT: Do you wish to take the witness on voir dire?

MR. SEALE: No, sir.

THE COURT: *Overruled.*

MR. SEALE: We except.

\*   \*   \*   \*.   \*   \*

## STATE'S EXHIBIT NO. 1

The following statement is given to Doyle Chambers and James Manning who have identified themselves as Detectives Mobile Sheriff's Office.

Q What is your full name?

A Lee Henry Dotson.

Q When were you born?

A July 10, 1932.

Q What is your address?

A Rt. 1, Box 2, Grand Bay, Ala.

Q How much education do you have?

A 11th grade.

Q Where do you work?

A Self-employed.

Q Are you married?

A Yes, four children.

Q Do you know Daniel Peyton also known as 'Pee Wee Boykin'?

A I know him.

Q How long have you known him?

A I guess all my life.

Q Were you frineds?

A Just run together sometimes.

Q When did you see him last?

A Saturday in Grand Bay.

Q Was this in Fernland near the barber shop?

A Yes.

Q What happened when you saw him if anything?

A I. drove up in my truck to get a haircut and Boykin was there in the back of Henry Hayes car with Hayes and somebody else.

Q What did you do then?

A I parked in front about 10 feet from their car. He got out

<u>Lee H. Dotson</u>
Signature of person giving voluntary statement

and come over to my truck. I asked him about a tool that he had taken off my truck Friday night.

He told me [sic] had it and I wasn't going to get it back. I asked him why did he hit my wife Friday night. He told me he would do the same to me.

He had the door open and was sitting on the edge of the seat. He started to run his right hand in his pocket. I had my gun laying on the seat between us. I picked it up and it went off.

He fell out of the truck on the ground. I went around to him. I closed the door. His uncle came out and said he was going to call an ambulance. I got in my truck and drove off because all those people were kin to him.

I went home. I told my wife what had happened. Then her sister came and we left and went out in Dawes. We called the hospital. They said he was dead. I said that was just as good a place as any to wait on the police to come.

Q When Boykin ran his hand towards his pocket did he say anything?

A He was cursing me.

Q Did you know if he had a weapon or not?

A No, sir.

Q Did he say he did?

A No he didn't.

Q You say the gun went off. How did this happen?

A I would like to wait to answer this until I talk to my lawyer.

Q What happened to the gun?

A I dropped it on the truck seat. I don't know what happened to it then.

Q When the gun fired where were you?

A I had one foot on the ground. After he lunged at me I jumped

Lee H. Dotson

Signature of person giving voluntary statement

out.

Q When you walked around and looked at him was he alive then?

A Yes.

Q Did you at any time call the law?

A No, sir.

Q What type gun was it?

A A .32 revolver.

Q Whose gun was it?

A My wife's.

Q How many times did you fire the gun?

A Just once.

Q Do you know where the bullet struck Boykin?

A No sir I don't.

Q Were you and he alone in the truck?

A Yes.

Q Did anyone say anything to you before you shot him?

A Not that I know of.

Q Are all the above statements true and correct to the best of your knowledge?

A Yes.

S/Lee H. Dotson

\* \* \* \* \* \*

MR. PFLEGER: Now, if the Court please, I would like to read the statement to the jury.

THE COURT: Either one of you can read all or either part of it."

(Italics supplied).

As to the so called warning, I note that the presence of a lawyer for an indigent was to be contingent on the "court" appointing and paying a lawyer. At that time Act No. 526, September 16, 1963, empowered circuit courts or courts of like jurisdiction or courts wherefrom a direct appeal lay to either the Supreme Court or the former Court of Appeals as the only trial courts to appoint and order payment for counsel for indigent defendants. The power under this Act is conferred *after* the defendant was charged. Hence, the statement read to Dotson was meaningless as to the appointment of counsel for an interrogation before indictment if he could not afford to hire counsel.

In Square v. State, 283 Ala. 548, 219 So. 2d 377, the warning on this point read, "We have no way of giving you a lawyer, but one will be appointed for you, if you wish, if and when you go to Court."

The opinion states:

"The italicized clause suggests that a lawyer will be provided only if defendant goes to court and negates the idea that a lawyer will be appointed 'prior to any questioning.' "

\* \* \* \* \* \*

"Recently, in Lathers v. United States, 5 Cir., 396 F.2d 524, 535, the court said:

" 'The *Miranda* warning must effectively convey to the accused that he is entitled to a government-furnished counsel 'here and now. If the words are subject to the construction that such counsel will be available only in the future, *Miranda* has not been obeyed. . . . . . .'

"Without further extending this opinion, we hold that the warning given to

defendant· in the instant case was insufficient under *Miranda* and the court erred in admitting the confession."

In the instant case the defendant was indicted February 4, 1970. On February 27 he appeared before the Circuit Court, waived indictment and pled not guilty with James Atchison, Esq. present with him as his counsel.

At the trial June 22, 1970, he was represented by Harry Seale, Esq. apparently as retained counsel. Dotson made bond before conviction for $1,500 and afterwards for $9,000.

In this court Robert G. Kendall, Esq. has appeared· for Dotson. No order of his being appointed counsel appears in the record or the briefs. Accordingly we think it is ́fair to infer that Dotson is not proceeding in forma pauperis.

The three preceding paragraphs are directed to the problem raised in the extension of the *Square* opinion (c. f. 283 Ala. at 551, 219 So.2d at 379) by reference to McCants v. State, 282 Ala. 397, 211 So.2d 877.

As we understand *McCants*, supra, as *Square*, supra, interprets it, McCant's mother had on the night of August 20 employed and talked to Vernon Crawford, Esq., to represent her son. Apparently this knowledge was imputed by our Supreme Court to the defendant through the testimony of Captain Burch.

Here nothing is shown that Dotson had a lawyer (or knew that any one of his later advocates would represent him) at the time of his confession. While we consider that Dotson made no showing that he was indigent yet neither did the State make any effort to show that the *Square* rule, supra, was not operative.

The opinions in United States v. Hayes, 4 Cir., 385 F.2d 375 and State v. Adams, 76 Wash.2d 650, 458 P.2d 558, both cited in Ex parte State, Ala., 265 So.2d 162, are not in point by far.

In *Hayes*, supra, the defendant was portrayed as displaying poise and cunning "in passing in rapid succession a series of false checks in fashionable apparel stores * *." Also, instead of immediately yielding to interrogation, Hayes made a telephone call. After about thirty minutes of questioning he called a halt and demanded consultation with a lawyer.

In *Adams*, supra, the defendant was twice advised of his rights, once filling in certain blanks in a statement of them, then brought before a municipal judge, informed of the charges against him and for a third time, advised of his rights. At all times defendant stated that he had a lawyer. On the last occasion he stated that he would be getting another.

Only then did the police begin interrogating Adams. He declined to answer three questions.

On the next day, June 20, 1966, Adams appeared before another court and was advised of his rights. He again said he already had an attorney. He did not ask for him. The court passed the case.

Two days later he was again interrogated by two officers. He declined to answer one question. A third interrogation was conducted June 24, the accused again declining to answer one question. Between the second and third interrogations he was visited by, inter alios, his lawyer.

Each case of waiver rests on its own facts, Narro v. United States, 5 Cir., 370 F.2d 329. Factually, there is no analogy between Dotson's case and Adams's.

True, our Supreme Court in Ex parte State, supra, has rejected our view that *Miranda* requires a written or oral waiver by a confessant. That court nevertheless did acknowledge that the facts and circumstances of a particular case must affirmatively show a knowing, voluntary and intelligent waiver to the reasonable satisfaction of the judge who holds the hearing. Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908; Lego v. Twomey, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618.

If not by words, then what? Presumably the nod of a head with alert eyes would suffice. Perhaps a witness's description of the alacrity with which the defendant responded. Other conduct of similar import comes to mind. Usually in other cases we find indirect expression such as, "Yeah, I know all about that bull" or "O. K., O. K., lets get on with it; I got nothing to hide." Presence of counsel may be a circumstance showing waiver of the right against self-incrimination.

*Miranda*, itself expressly requires some tangible proof other than mere silence of the accused or the simple "fact that a confession was in fact eventually obtained." 384 U.S. at 475, 86 S.Ct. at 1628, citing Carnley v. Cochran, 369 U.S. 506, 516, 82 S.Ct. 884, 8 L.Ed.2d 70 and Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680. Again we find:

> "Moreover, where in-custody interrogation is involved, there is no room for the contention that the privilege is waived if the individual answers some questions or gives some information on his own prior to invoking his right to remain silent when interrogated." 384 U.S. 475, 476, 86 S.Ct. 1628.

Earlier in that opinion we find:

> "An individual need not make a pre-interrogation request for a lawyer. While such request affirmatively secures his right to have one, his failure to ask for a lawyer does not constitute a waiver. No effective waiver of the right to counsel during interrogation can be recognized unless specifically made after the warnings we here delineate have been given. The accused who does not know his rights and therefore does not make a request may be the person who most needs counsel." 384 U.S. 470, 471, 86 S.Ct. 1626.

And on pp. 474 and 475, 86 S.Ct. p. 1628 we find:

> "If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent."

> \* \* \* \* \* \*

> "If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel. Escobedo v. State of Illinois, 378 U.S. 478, 490, n. 14, 84 S.Ct. 1758, 12 L.Ed.2d 977. This Court has always set high standards of proof for the waiver of constitutional rights, Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), and we reassert these standards as applied to in-custody interrogation. Since the State is responsible for establishing the isolated circumstances under which the interrogation takes place and has the only means of making available corroborated evidence of warnings given during incommunicado interrogation, the burden is rightly on its shoulders."

In describing the circumstances of the giving of the statement to the deputies the record is silent as to compliance with Code 1940, T. 15, § 160 or its cognate statutes, e. g., T. 15, § 123. In Fikes v. Alabama, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246, the Supreme Court of the United States recognized that Alabama does not follow the rule in McNabb v. United States, 318 U.S. 332.

However, that court did say that the failure to take a confessant to a committing magistrate before interrogating him was "relevant circumstantial evidence in the inquiry as to physical or psychological coercion" citing Stein v. New York, 346 U.S. 156, 73 S.Ct. 1077, 97 L.Ed. 1522. See also

Davis v. State, 44 Ala.App. 145, 204 So.2d 490; State v. La Fernier, 37 Wisc.2d 365, 155 N.W.2d 93: the Circuit Court had granted a new trial. Defendant had been asked by an officer to submit to polygraph examination; when brought to the examination room he made a spontaneous inculpatory statement. No *Miranda* warnings had been given.

> "* * * We interpret the language 'prior to any questioning' to mean just that and would exclude the oral statement given here. The questioning need not relate to the specifics of the crime for the psychological coercion inherent in custodial interrogation to result. Nor does it only result when the confession immediately follows the interrogation."

The judgment granting a new trial was affirmed.

In Alexander v. United States, 8 Cir., 380 F.2d 33, a circumstance to support waiver was a later colloquy before the United States Commissioner where the defendant did have counsel.

There is a written waiver in Sullins v. United States, 10 Cir., 389 F.2d 985. But before hand other statements had been given after oral *Miranda* warnings. The officers testified that at no time (on the earlier occasions) did the defendant expressly say that he "did not want to consult a lawyer before making a statement." This failure *to specifically* decline consultation was held to be fatal to the admissibility of the inculpatory statements.

From United States v. Thompson, 4 Cir., 417 F.2d 196, I quote:

> "Thompson complains that an oral confession given to agents of the F.B.I. was admitted even though he had refused to sign a written waiver of his rights. The evidence discloses that Thompson, an intelligent man, was informed of his rights in the manner required by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). He declined to sign a written waiver, but *he stated that he understood his rights.* Thereafter he freely and voluntarily answered questions. He was not subjected to prolonged interrogation or in any way coerced. In view of Thompson's intelligence, his affirmative statement that he understood the explanation of his rights, and the voluntariness of his confession, we hold that his refusal to sign a written waiver did not render the confession inadmissible. United States v. Hayes, 385 F.2d 375 (4th Cir. 1967), cert. denied, 390 U.S. 1006, 88 S.Ct. 1250, 20 L.Ed.2d 106 (1968)." Italics added.

In passing I would call attention to (1) intelligence, (2) an affirmative statement of understanding, and (3) voluntariness in confessing.

The appellant in Pettyjohn v. United States, 136 U.S.App.D.C. 69, 419 F.2d 651, had appeared at a police station saying he wanted to turn himself in because he had murdered two persons. After arrest the appellant was given a card to read which read as follows:

"WARNING AS TO YOUR RIGHTS

You are under arrest. Before we ask you any questions, you must understand what your rights are. You have the right to remain silent. You are not required to say anything to us at any time or to answer any questions. Anything you say can be used against you in court. You have a right to talk to a lawyer for advice before we question you and to have him with you during questioning. If you cannot afford a lawyer and want one, a lawyer will be provided for you. If you want to answer questions now without a lawyer present you will have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.

*"Consent to speak*

"I know what my rights are. I am willing to make a statement and answer questions, I do not want a lawyer. I understand what I am doing. No prom-

ises or threats have been made to me or used against me."

Appellant said that he had read the card and understood.

The desk sergeant then asked Pettyjohn if he wanted a "legal neighborhood lawyer." The answer was, "No." Thereafter, following another warning having been read to him, Pettyjohn related a detailed confession to a detective. But at this point appellant indicated that he did not want to give a typewritten statement. Then at the Homicide Squad office he signed a consent and waiver.

*Held*: (1) the signed waiver was inadmissible because of the failure to take Pettyjohn before a United States Commissioner (instead of to the Homicide Squad office) as soon as he indicated he did not want to talk any more; (2) the confessions given before that time were admissible.

In Smith v. Rhay, 9 Cir., 419 F.2d 160, a habeas corpus action brought by a Washington convict the opinion states in part:

"As to the introduction at trial of Smith's alleged oral confessions, the record does not clearly disclose that he was warned of his rights with the specificity required in Miranda v. Arizona, 384 U.S. 436, 478–479, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Although Smith was told that he had the right to an attorney, he was not, insofar as the record of the hearing before the trial judge concerning the admissibility of the confessions indicates, told, as required by *Miranda*, that he had the right to the presence of an attorney and that, if he could not afford one, a lawyer could be appointed to represent him *prior to any questioning*. Smith could not have made a knowing and intelligent waiver of his rights until *after* the required warnings had been given."

See also Frazier v. United States, 136 U.S. App.D.C. 180, 419 F.2d 1161.

The Fifth Circuit in United States v. Daniel, 441 F.2d 374, had before it a distilling case wherein the arresting agent gave the *Miranda* warnings. Furthermore, the agent testified that the defendant stated that he understood. Citing United States v. Montos, 5 Cir., 421 F.2d 215, the opinion quoted therefrom:

"* * * All that the prosecution must show is that the defendant was effectively advised of his rights and that he then intelligently and understandingly declined to exercise them * * *."

Further citing among others United States v. Hayes, supra.

In United States v. Alexander, 441 F.2d 403, the Third Circuit distinguished Frazier v. United States, supra, and allowed to be admissible so much of a statement made after waiver up to the point where the defendant refused to answer further and asked for a lawyer.

Since 1968 the United States may appeal interlocutorially from an order of a district court which suppresses or excludes evidence, etc., under 18 U.S.C. § 3731 as amended. United States v. Phelps, 5 Cir., 443 F.2d 246, was such an appeal. Therein the opinion states:

"In the present case the record shows that immediately after the investigators discovered the illegal weapon, they properly warned Phelps of his rights. Phelps, while professing to understand and declining the assistance of a lawyer, indicated by his refusal to sign the waiver that he did not wish to waive his right to remain silent. The officers' interrogation, therefore, should have ceased at this point.

"However, even though questioning must cease at this point, we have held that the mere refusal to sign a waiver does not automatically render inadmissible all further statements of the defendant. In United States v. Hopkins, 5 Cir. 1970, 433 F.2d 1041, a situation arose which may well be similar to the instant case. There the defendant refused to sign the waiver form, but when the interrogating agent got up to leave, the de-

fendant initiated further conversation. We held that the subsequently obtained information was admissible because the defendant had waived his right to remain silent by voluntarily initiating subsequent conversation regarding his alleged complicity in the offense under investigation. * * *"

"In the present case we are unable to tell whether Phelps validly waived his right to remain silent or not. It is clear that after Phelps refused to sign the waiver, the officers should have ceased interrogating him. It is also clear that subsequent conversation did occur between the investigators and Phelps. The hearing on the motion to suppress does not reveal, however, whether the subsequent questions by the officers were the result of voluntary conversation initiated by Phelps or whether these questions were initiated by the officers themselves without any instigation by Phelps. If the former situation obtains, then under our decision in *Hopkins*, Phelps' subsequent answers would be admissible. If the latter situation obtains, however, *Miranda* compels that we hold the answers inadmissible. The record of the hearing is silent as to these crucial facts, probably because the trial court made its determination prior to our decision in *Hopkins*. We think, therefore, that justice will be best served by holding a further evidentiary hearing to determine whether Phelps voluntarily waived his right to remain silent."

Citing Pettyjohn v. United States, supra, and United States v. Thompson, supra, the Sixth Circuit held in United States v. Stevens, 445 F.2d 304, that a signed writing was not indispensable to waiving the *Miranda* rights.

Pertinence for the instant enquiry is found in the pre-*Miranda* tried case of Frazier v. Cupp, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 from which I excerpt (pp. 738, 739, 89 S.Ct. p. 1424):

" * * * Shortly after he [Frazier] began he again showed signs of reluct- ance and said, 'I think I had better get a lawyer before I talk any more. I am going to get into trouble more than I am in now.' The officer replied simply, "You can't be in any more trouble than you are in now," and the questioning session proceeded. A full confession was obtained and, after further warnings, a written version was signed.

"Since petitioner was tried after this Court's decision in Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), but before the decision in Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966), only the rule of the former case is directly applicable. Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966). Petitioner argues that his statement about getting a lawyer was sufficient to bring *Escobedo* into play and that the police should immediately have stopped the questioning and obtained counsel for him. We might agree were *Miranda* applicable to this case, for in *Miranda* this Court held that '[i]f . . . [a suspect] indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning.' 384 U.S. at 444–445, 86 S.Ct. at 1612. But *Miranda* does not apply in this case. This Court in Johnson v. New Jersey pointedly rejected the contention that the specific commands of *Miranda* should apply to all post-*Escobedo* cases. The Court recognized "[t]he disagreements among other courts concerning the implications of *Escobedo*," Johnson v. New Jersey, supra, 384 U.S. at 734, 86 S.Ct. at 1781, and concluded that the States, although free to apply *Miranda* to post-*Escobedo* cases, id., at 733, 86 S.Ct. 1772, were not required to do so. The Oregon Supreme Court, in affirming petitioner's conviction, concluded that the confession was properly introduced into evidence. Under *Johnson*, we would be free to disagree with this conclusion only if we felt compelled to do so by the specific holding of *Escobedo*.

"We do not believe that *Escobedo* covers this case. Petitioner's statement about seeing an attorney was neither as clear nor as unambiguous as the request *Escobedo* made. The police in *Escobedo* were unmistakably informed of their suspect's wishes; in fact Escobedo's attorney was present and repeatedly requested permission to see his client. Here, on the other hand, it is possible that the questioning officer took petitioner's remark not as a request that the interrogation cease but merely as a passing comment. Petitioner did not pursue the matter, but continued answering questions. In this context, we cannot find the denial of the right to counsel which was found so crucial in *Escobedo*."

Compare the pre-*Miranda* case of People v. Ranes, 385 Mich. 234, 188 N.W.2d 568.

The only mention by either detective Chambers or defendant Dotson as to the latter consulting a lawyer is in the following dialogue at the interrogation:

"Q. You say the gun went off. How did this happen?

A. I would like to wait to answer this until I talk to my lawyer." (R. 46)

Later while reading the confession to the jury the assistant District Attorney reached this point and interpolated:

"At this point I would like to interrupt and ask Mr. Doyle Chambers, if the Court please, another question.

"THE COURT: All right.

MR. PFLEGER: When he made that statement, did you then advise him of anything, Mr. Chambers.

A Yes, I did, concerning the—

MR. SEALE: He could go ahead with the confession."

What Mr. Chambers advised the defendant of is left dangling untold. I find no *conduct* or language from which a waiver can rationally be inferred.

The harmless error rule of Supreme Court Rule 45 does not apply here. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705; Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed. 2d 284. These two cases require a finding that a constitutional error be harmless beyond a reasonable doubt.

I consider that no other reasonable jury properly charged as to the law, hearing all the evidence in the record before us *except the confession*, would come to a different verdict. This standard is applied in Mississippi. Reed v. State, 237 Miss. 23, 112 So. 2d 533; 29 Miss.L.J. 381–385.

Nonetheless under Chapman and Harrington, supra, I think that we are compelled to reverse because the instant record in fact contains no waiver, express or necessarily implied, of the *Miranda* right to have counsel at the interrogation.

I vote to reverse, both on *Square*, supra, and on *Miranda*.