Eugene R. **FRAZIER**, Appellant,

v.

**UNITED STATES of America,**
Appellee.

No. 21426.

United States Court of Appeals
District of Columbia Circuit.

Argued May 21, 1968.

Decided March 14, 1969.

Petition for Rehearing Denied
June 21, 1969.

Burger, Circuit Judge, concurring and dissenting in part.

Mr. Ira S. Siegler, Washington, D. C. (appointed by this court) for appellant.

Mr. Joel M. Finkelstein, Asst. U. S. Atty., with whom Messrs. David G. Bress, U. S. Atty., and Frank Q. Nebeker, Asst. U. S. Atty., were on the brief, for appellee.

Before BAZELON, Chief Judge, and BURGER and ROBINSON, Circuit Judges.

SPOTTSWOOD W. ROBINSON, Circuit Judge:

This is an appeal[1] from a conviction for the armed robbery[2] of the Meridian Market on August 24, 1966. The Government's proof against appellant consisted of in-court identifications by the proprietor and an employee of the market, and an oral confession by appellant while detained by the police after his arrest. Appellant offered no evidence in his own behalf. He now argues, as he did at trial, that the presiding judge should have excluded both the confession and the identifications, and thus left the Government with a case no better than his defense.

Both confessions and identifications made while an accused is in police custody without benefit of counsel are constitutionally suspect.[3] Appellant's contentions on this appeal thus not atypically invoke doctrinal considerations that would have a vitiating effect on each prong of the Government's presentation unless exempted by special conditions. Accordingly, we must examine closely the circumstances surrounding appellant's confession and identifications in order to determine whether they pass the strict tests for admissibility which have been judicially prescribed.

I

Appellant was arrested at 4:15 p. m. on September 7, 1966, pursuant to a warrant issued in connection with a robbery at Mike's Carry Out, and was taken to a precinct station. Upon arrival at about 4:30 p. m., the arresting officer immediately telephoned Detective Sergeant Robert T. Keahon, of the Robbery Squad, who instructed him to book appellant and bring him directly to the Robbery Squad office at police headquarters. At a pretrial hearing, held to pass upon the admissibility of the confession, Keahon testified that all arrestees brought to a precinct station are subsequently conveyed to headquarters for processing, that is, fingerprinting, photographing and completion of the "line-up sheet." In addition, Keahon stated that he was personally in possession of appellant's arrest warrant, "was familiar with the case, and * * * was going to handle the case. * * *"

The arresting officer called in a police wagon from the streets and, when it arrived, drove appellant through closing hour traffic to police headquarters, and presented him to Keahon at 5:20 p. m. Keahon ascertained that appellant had been advised of his rights by the arresting officer, and read to him from a form which gave the Miranda[4] warnings in some detail. Appellant said he understood the contents of the form, did not want a lawyer, and would obtain one the next morning if necessary. He then signed a statement to the effect that he knew his rights and did not desire the assistance of counsel.

Keahon then "started talking to him about the Mike's Carry Out," the offense for which he had been arrested, but before he could utter more than a few words, appellant exclaimed, "I don't care, I want to clear Ted. Teddy didn't do it. * * * Teddy didn't shoot that woman in the High's store or rob her. I did." "Teddy," it developed, was one Theodore Moore, who had been arrested for a robbery at a High's Market. With that, appellant proceeded to confess, without prompting, to a series of other

1. Heard together with No. 21,427, Bryson v. United States, now pending before this court, which is an appeal from a conviction for the same offense.

2. D.C.Code § 22–2901 (1967 ed.), since amended (Supp. I 1968).

3. As to confessions, Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); see also Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964). As to identifications, United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967); Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967).

4. Miranda v. Arizona, supra note 3, 384 U.S. at 467–473, 86 S.Ct. 1602.

recent crimes, the fourth of which was the Meridian Market holdup for which he was convicted in this case. Keahon testified that he asked appellant no questions whatever about that affair except to identify the market appellant was admitting he had robbed.

The Meridian Market confession was made at 5:45 p. m. When appellant finished confessing to various other offenses, Keahon brought in witnesses to identify him.[5] Formal processing was completed at about 7:30 p. m., and appellant was taken before the United States Commissioner on the following morning.

## II

Appellant contends that his confession was inadmissible under Mallory v. United States [6] because it was obtained during a period of unnecessary delay in his presentment before a judicial officer. The Government denies a *Mallory* violation and argues that, even if there were one, the confession is admissible under Title III of the so-called District of Columbia Crime Bill.[7] We think the record raises a substantial question as to whether appellant's transfer from the precinct station to police headquarters was an unnecessary delay in terms of contemporary judicial construction of Rule 5(a) of the Federal Rules of Criminal Procedure.[8] We do not, however, reach that question, or the sensitive issues concerning the applicability[9] and constitutionality of Title III which lurk behind it, because the case is properly resolvable on another basis.

Appellant attacks his confession on *Miranda*[10] as well as *Mallory* grounds, alleging that he did not effectively waive his Fifth Amendment privilege against self-incrimination. Our decisions have recognized the importance of inquiry as to whether the accused was effectively apprised of his rights when the admissibility of a confession under *Mallory* is at stake.[11] And as we recently observed in Naples v. United States,[12] which involved a pre-*Miranda* confession, the evolution in our understanding of *Mallory* has

> "paralleled the visible movement by the Supreme Court towards the application of Fifth and Sixth Amendment considerations to the pre-arraign-

5. This aspect of the case is discussed *infra*, pt. IV.

6. 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957).

7. 81 Stat. 734, 735–736 (1967). Title III in pertinent part provides:

"Sec. 301(a) Any person arrested in the District of Columbia may be questioned with respect to any matter for a period not to exceed three hours immediately following his arrest. Such person shall be advised of and accorded his rights under applicable law respecting any such interrogation. * * *

"(b) Any statement, admission, or confession made by an arrested person within three hours immediately following his arrest shall not be excluded from evidence in the courts of the District of Columbia solely because of delay in presentment."

8. "An officer making an arrest under a warrant issued upon a complaint or any person making an arrest without a warrant shall take the arrested person without unnecessary delay before the nearest available commissioner or before any oth-er nearby officer empowered to commit persons charged with offenses against the laws of the United States. * * *" F.R.Crim.P. 5(a).

9. The question is whether the statute operates retroactively to require admission of a confession obtained prior to its enactment in the course of an unnecessary delay in presenting an accused before a judicial officer.

10. Miranda v. Arizona, *supra* note 3.

11. See Naples v. United States, 127 U.S. App.D.C. 249, 258, 382 F.2d 465, 474 (1967), and cases cited in n. 10. In Alston v. United States, 121 U.S.App.D.C. 66, 67–68, 348 F.2d 72, 73–74 (1965), Judge McGowan, in his separate opinion, deemed the fact that appellant "was not, prior to his interrogation, informed of his right to remain silent or of the fact that such answers as he chose to give might be used against him" at trial a "decisive consideration" in his conclusion that *Mallory* required barring of the confession.

12. *Supra* note 11.

ment period. That movement culminated, of course, in *Miranda,* in the shadow of which Rule 5(a) now resides and which has probably made academic problems of the kind we confront on this record." [13]

Now we must consider directly the effect on *Mallory* of a *Miranda* that has come of age.

Although not explicitly premised on constitutional grounds, *Mallory* has been ultimately concerned with effectuation of Fifth and Sixth Amendment protections against the dangers of involuntary self-incrimination in stationhouses and with the other evils inherent in police interrogation of an accused in secret.[14] "[T]he delay [in presentment before a magistrate]," *Mallory* admonished, "must not be of a nature to give opportunity for the extraction of a confession."[15] Its parent opinion, McNabb v. United States,[16] rested on the proposition that "[l]egislation [comparable to Rule 5 (a)] * * *, requiring that the police must with reasonable promptness show legal cause for detaining arrested persons, constitutes an important safeguard—not only in assuring protection for the innocent but also in securing conviction of the guilty by methods that commend themselves to a pro-

gressive and self-confident society. For this procedural requirement checks resort to those reprehensible practices known as the 'third degree' which, though universally rejected as indefensible, still find their way into use. It aims to avoid all the evil implications of secret interrogation of persons accused of crime." [17]

*Mallory* itself has stood guard against not only the "third degree," but also "the pressures in a Police Station upon prisoners under secret interrogation without counsel, relative or friend."[18] These, of course, are precisely the concerns of *Miranda.*

The *Mallory* solution for these iniquities was enforcement by an exclusionary rule of the requirement that the accused be brought "before a judicial officer as quickly as possible so that he may be advised of his rights * * *." [19] But this remedy was at best imperfect because some delay in presentment is unavoidable and, as *Mallory* concedes, additional delays for some purposes may be justifiable.[20] Such postponements are, of course, as susceptible to abuses as any others, and experience has exemplified the difficulty inherent in ascertaining either the real purpose of a challenged delay or the actual nature of

13. 127 U.S.App.D.C. at 258, 382 F.2d at 474.

14. Spriggs v. United States, 118 U.S.App. D.C. 248, 251, 335 F.2d 283, 286 (1964).

15. 354 U.S. at 455, 77 S.Ct. at 1360.

16. 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943).

17. *Id.* at 343–44, 63 S.Ct. at 614.

18. Spriggs v. United States, *supra* note 14, 118 U.S.App.D.C. at 250, 335 F.2d at 285.

19. 354 U.S. at 454, 77 S.Ct. at 1359. *Mallory* and its progeny have also voiced concern at the possibility that police may interrogate, or otherwise use a delay in presentation before a magistrate, to obtain probable cause to support the arrest. Whenever it appears that an arrest was made without probable cause, a question may arise independently of *Mallory* as to whether evidence subsequently obtained in violation of Rule 5(a) must be excluded as fruit of the illegal arrest. See Adams v. United States, 130 U.S.App.D.C. 203, 399 F.2d 574 (1968); Bynum v. United States, 104 U.S.App. D.C. 368, 262 F.2d 465 (1958). *Mallory,* however, which applies regardless of the legality of the arrest, and which has been read to exclude only testimonial evidence, see cases cited in *Adams, supra,* 130 U.S. App.D.C. at 205, n. 4, 399 F.2d at 576, n. 4, is ill-suited for more than incidental impact on that problem.

20. 354 U.S. at 455, 77 S.Ct. 1356. See also Alston v. United States, *supra* note 11, 121 U.S.App.D.C. at 68, 348 F.2d at 74 (opinion of Judge McGowan).

interrogations carried out behind closed stationhouse doors.[21]

■ In *Miranda,* the Supreme Court eschewed this uncertain detour through Rule 5(a) and attacked the problem of custodial interrogation directly. It held that the accused is entitled to the assistance of counsel before he is questioned and, in effect, that any confession he makes while in exclusive police custody prior to arraignment is presumptively inadmissible under the Fifth and Sixth Amendments. Such confessions can stand if, but only if, the accused affirmatively and understandingly waives his rights, and the Government bears "a heavy burden" in attempting to show such a waiver.[22]

■ Thus, absent convincing evidence of waiver, no confession may be admitted, regardless of the dispatch with which the accused is presented before a magistrate. Conversely, should the Government carry its burden, we think it follows that the confession is not inadmissible solely on the ground that the accused was not taken before a magistrate at the earliest possible moment. A valid *Miranda* waiver is necessarily, for the duration of the waiver,[23] also a waiver of an immediate *judicial* warning of constitutional rights.[24] And what *Miranda,* as a constitutional interpretation, leaves an accused at liberty to yield, he may, we believe, forego equally under *Mallory.*[25] Provided the exacting

21. Compare the majority with the dissenting opinions in, *e. g.,* Coor v. United States, 119 U.S.App.D.C. 259, 340 F.2d 784 (1964), cert. denied 382 U.S. 1013, 86 S.Ct. 621, 15 L.Ed.2d 527 (1966); Muschette v. United States, 116 U.S. App.D.C. 239, 322 F.2d 989 (1963), vacated on other grounds 378 U.S. 569, 84 S.Ct. 1927, 12 L.Ed.2d 1039 (1964); Heideman v. United States, 104 U.S.App. D.C. 128, 259 F.2d 943, cert. denied 359 U.S. 959, 79 S.Ct. 800, 3 L.Ed.2d 767 (1958). This case itself is illustrative of the difficulty: the police practice of processing at headquarters persons arrested at the precinct may or may not be essential to efficient police administration; if it is essential, it nonetheless presents obvious opportunities for improper interrogation.

22. After the warnings have been given "[i]f the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel. * * * This Court has always set high standards of proof for the waiver of constitutional rights, Johnson v. Zerbst, 304 U.S. 458 [58 S. Ct. 1019, 82 L.Ed. 1461] (1938), and we re-assert these standards as applied to incustody interrogation." Miranda v. Arizona, *supra* note 3, 384 U.S. at 475, 86 S.Ct. at 1628.

23. A valid waiver ceases to be effective whenever the accused indicates in any

manner that he wishes to remain silent or that he wants an attorney. Miranda v. Arizona, *supra* note 3, 384 U.S. at 473–74, 86 S.Ct. 1602, 16 L.Ed.2d 694.

24. *Miranda* implicitly assumes that it is possible for the police to convey to the accused sufficient understanding of his rights to enable him to make an intelligent waiver. A police warning, to be effective, must be given with proper solicitude for actual understanding. Moreover, a waiver made in the coercive atmosphere of police custody is less likely to be voluntary than one made before a commissioner. Thus the Government carries such a weighty burden of proving waiver in cases involving confessions to the police. But irrespective of who gives the warnings or takes the confessions, the ultimate question is whether the waiver is voluntary in the full sense of the word. If an accused did not understand what a magistrate told him, an ensuing confession would not be rendered admissible because he had been advised of his rights by a judicial officer. Similarly, under *Miranda,* a waiver may be valid even though made on the basis of police warnings.

25. We do not conclude, however, that in waiving his right to remain silent, the accused also impliedly waives his right to complain of a *prior* violation of Rule 5(a). Rather, we construe *Mallory* not to require exclusion of an otherwise admissible confession because of a brief delay in obtaining a *Miranda* waiver.

standards for waiver are met, the overriding purpose of *Mallory* has been served.[26]

By no means is this to say that unjustified delay in compliance with Rule 5(a) has no bearing on the admissibility of a confession forthcoming during a period of such delay. As *Miranda* made clear,

"[w]hatever the testimony of the authorities as to waiver of rights by an accused, the fact of lengthy interrogation or incommunicado incarceration before a statement is made is strong evidence that the accused did not validly waive his rights. In these circumstances the fact that the individual eventually made a statement is consistent with the conclusion that the compelling influence of the interrogation finally forced him to do so. It is inconsistent with any notion of a voluntary relinquishment of the privilege." [27]

Thus, the greater the tardiness in presentment prior to a confession, the heavier the Government's already "heavy burden" of showing effective waiver. Certainly some conceivable delays are so long that no subsequent confession could be deemed the product of voluntary waiver. And nothing in *Miranda* affects the admissibility *vel non* of evidence of any sort obtained during detention following an illegal arrest.[28]

### III

Thus the vital question here is whether appellant voluntarily and understandingly waived his *Miranda* rights. If he did not, his confession was inadmissible under *Miranda*. If he did, the confession was admissible even if the purpose inspiring his transfer to police headquarters was interrogation for the production of evidence.[29]

---

26. Rule 5(a) also confers upon the accused a prompt opportunity to persuade a *magistrate*, at a preliminary hearing under Rule 5(c), that there is no probable cause for holding him. While, of course, that policy remains in force, see Adams v. United States, *supra* note 19, 130 U.S.App.D.C. at 208, 399 F.2d at 579, *Mallory* has enforced it only coincidentally, since it has no effect if no incriminating evidence is obtained as a result of the delay, and since it has been read not to apply where the unnecessary delay in presentment to a magistrate occurs *after* a confession. Coor v. United States, *supra* note 21, 119 U.S.App.D.C. at 260, 340 F.2d at 785, Bailey v. United States, 117 U.S.App.D.C. 241, 328 F.2d 542, cert. denied 377 U.S. 972, 84 S.Ct. 1655, 12 L.Ed.2d 741 (1964); Lockley v. United States, 106 U.S.App. D.C. 163, 270 F.2d 915 (1959); Porter v. United States, 103 U.S.App.D.C. 385, 258 F.2d 685, 692 (1958), cert. denied 360 U.S. 906, 79 S.Ct. 1289, 3 L.Ed.2d 1257 (1959); and see United States v. Mitchell, 322 U.S. 65, 70–71, 64 S.Ct. 896, 88 L.Ed. 1140 (1944).

If probable cause is found, Rule 5(a) still serves to promote early consideration of an accused's admission to bail. This function of the rule has taken on added importance with the enactment of the Bail Reform Act, 80 Stat. 214 (1966), 18 U.S.C. § 3146 *et seq.* But for the same reason that *Mallory* has little relevance to the goal of assuring expeditious determination of the existence of probable cause, it is not a significant antidote to the problem of delays in bail hearings.

Rule 5(a) also serves to provide early warning by a magistrate of the right to counsel, which may be important in protecting an accused's interest at a line-up. See Williams v. United States, —— U.S.App.D.C. ——, 419 F.2d 740 (Dec. 20, 1968). Thus, identification evidence obtained in the absence of counsel may be excluded independently of the rules of United States v. Wade, Gilbert v. California, and Stovall v. Denno, all *supra* note 3, if it is obtained during an "unnecessary delay" in presentment. If the right to counsel has been validly waived under *Miranda*, however, this issue will not arise. Moreover, even in the absence of a waiver, if counsel was in fact present at the challenged confrontation, and if the resulting identification is otherwise admissible, *Mallory* does not require its exclusion because of a violation of Rule 5(a). Williams v. United States, *supra*, 136 U.S.App.D.C. at ——, n. 9, 419 F.2d at 746, n. 9.

27. 384 U.S. at 476, 86 S.Ct. at 1629.

28. See note 19, *supra*.

29. *Cf.* Naples v. United States, *supra* note 11.

The record discloses that appellant objected when, as he began his string of confessions, Sergeant Keahon started to take notes on his confession. How strenuously he objected does not appear, but it is noteworthy that Keahon stopped writing at that point. He testified entirely from memory to the details of the confession, which was made a year before the trial began, explaining that

> "at the beginning of his admission, I started to write notes, and he stopped me and said: Don't write anything down. I will tell you about this but I don't want you to write anything down." [30]

 The strong implication is that appellant thought his confession could not be used against him so long as nothing was committed to writing. If, as his avowed motive for confessing suggests, he was brooding over a guilty conscience while the warnings were being given, he might well have failed to absorb their message. Or he may simply have been laboring under the common misapprehension that the police could not use in court anything he said unless they were able to introduce a written statement. Whatever the reason, the evidence raises a serious question as to whether he intelligently waived his right to remain silent.[31]

 Appellant was given the *Miranda* warnings in their entirety. He signed what purported to be an express waiver. If there were no other evidence in the record, the Government would have discharged its burden, and no further inquiry would be necessary. But while "[a]n express statement that the individual is willing to make a statement and does not want an attorney followed closely by a statement *could* constitute a waiver," [32] *Miranda* teaches that in many circumstances it does not.[33] Here, Sergeant Keahon's testimony suggests powerfully that the waiver was not understandingly made; in addition, the hour appellant spent in custody before the ceremonial "waiver" casts doubt on whether it was voluntarily made. Since the Government offered no evidence to dispel these doubts, we cannot say on this record that it carried its "heavy burden * * * to demonstrate that the defendant knowingly and intelligent-

---

30. We cannot agree with our dissenting colleague (*infra* p. 1176) that "[t]he record raises the possibility that the only statements put into evidence were those made *prior* in time to Appellant's alleged equivocations." The confession at issue was the fourth in a series made by appellant to Sergeant Keahon, who testified that appellant put a stop to notetaking "[a]t the beginning of his admission," when he was narrating the first robbery in the series. If Sergeant Keahon was not admonished about notetaking until after the challenged confession was given, we must disbelieve his explanation as to why he had no notes concerning it.

31. The thrust of *Miranda* is that in order to permit "a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and *effectively* apprised of his rights * * *." 384 U.S. at 467, 86 S.Ct. at 1624 (emphasis added). Specifically included among the warnings the Court found essential to an *adequate* apprisal is notice of the fact that "anything said can and will be used against the individual in court." *Id.* at 469, 86 S.Ct. at 1625. This warning is needed in order to make him aware of the consequences of foregoing his privilege not to speak. "It is only through an awareness of these consequences that there can be any assurance of real understanding and intelligent exercise of the privilege." *Id.* And as this explanation suggests, a warning is not *effective* if it is not understood. Thus, contrary to the thesis of the dissent, incriminating statements may be involuntary, and thus "compelled" within the meaning of the Fifth Amendment, even where the police are not at fault. *Cf.* note 24, *supra*. See Procter v. United States, 131 U.S.App.D.C. 241, 243–244, 404 F.2d 819, 821–822 (1968).

32. Miranda v. Arizona, *supra* note 3, 384 U.S. at 475, 86 S.Ct. at 1628 (emphasis added).

33. *Id.* at 475–76, 86 S.Ct. 1602, 16 L.Ed. 2d 694.

ly waived his privilege against self-incrimination * * *." [34]

██ The Government argues, however, that because the question was not raised below, appellant should not be allowed to present it here. We disagree. Appellant's counsel [35] was initially confronted with the signed waiver and what appeared to be a spontaneous confession. It is scarcely surprising that he prepared a *Mallory*, not a *Miranda*, argument. The evidence connoting that appellant did not understandingly waive his rights did not develop until the direct examination of Sergeant Keahon. Defense counsel then made an apparent attempt to raise the issue in a general way, but the matter was lost in the *Mallory* argument he was pursuing. We do not demand more of appellants as a condition to litigation of issues fundamental in the criminal process.

██ Nonetheless, because the Government had no clear warning that it would need to produce more evidence, we are reluctant to reverse for a new trial. Appellant's ban on note-taking inveighs against intelligent waiver, but this inference might be overcome, for example, if Sergeant Keahon admonished him that even an oral confession would be used against him, and appellant replied that he knew that but still did not want anything written down. Absent some additional evidence, comparable in quality, of understanding waiver, however, his confession cannot stand. Accordingly, we shall remand the record in this case to the District Court for an evi-

dentiary hearing and findings of fact on the validity of appellant's purported waiver. [36]

## IV

Appellant also contends that the trial judge erred in permitting two eyewitnesses to the Meridian Market robbery to identify him at the trial as a participant. His argument is that these in-court identifications were products of prior extrajudicial identifications made in circumstances so unnecessarily suggestive and promotive of faulty recognition as to impinge on due process of law. [37] We deferred our disposition of this case to enable evaluation of appellant's claim in the light of the recent *Clemons* [38] decision by the full court.

██ One, but only one, of the pretrial episodes complained of falls within the area of constitutional condemnation. More than a month after appellant's arrest, Louis I. Reznick, the owner of the market, and William Simpson, an employee, both of whom were present when the holdup occurred, viewed appellant while confined in a cellblock. Appellant was the only person they were shown, and both witnesses knew at the time that appellant had confessed. As the Government now itself characterizes the incident, this single-suspect cellblock confrontation was "indeed suggestive"; so much so, we hasten to add, as to render it offensive to due process. [39]

██ The Government, however, did not rely upon the out-of-court iden-

---

34. Miranda v. Arizona, *supra* note 3, 384 U.S. at 475, 86 S.Ct. at 1628.

35. Not his counsel on this appeal.

36. Appellant, of course, may wish to testify at that hearing. See Simmons v. United States, 390 U.S. 377, 389–394, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); Bailey v. United States, 128 U.S.App. D.C. 354, 389 F.2d 305 (1967).

37. See Stovall v. Denno, *supra* note 3, 388 U.S. at 302, 87 S.Ct. 1967; Simmons v. United States, *supra* note 36, 390 U.S. at 384, 88 S.Ct. 967; Wright v. United States, 131 U.S.App.D.C. 279, at 282–

285, 404 F.2d 1256, at 1259–1262 (Jan. 31, 1968). Since the pretrial identifications occurred before the decisions in United States v. Wade and Gilbert v. California, both *supra* note 3, the fact that appellant was then unrepresented by counsel does not establish a constitutional violation. Stovall v. Denno, *supra* note 3, 388 U.S. at 300, 87 S.Ct. 1967.

38. Clemons v. United States, 133 U.S.App. D.C. 27, 408 F.2d 1230 (*en banc* Dec. 6, 1968).

39. *Id.* at 38, 42, 46–47, 408 F.2d at 1241, 1245, 1249–1250.

tifications at the trial.[40] The question, then, is whether the in-court identifications had a source sufficiently independent of the cellblock exhibition as to be free from its taint.[41] The trial court found that there was no taint, and we deem the evidence adequate to support that finding.[42]

Reznick and Simpson each testified at trial that they remembered appellant from impressions received at the time of the robbery. The offense was perpetrated by two men during daylight hours over a period of several minutes during which both Reznick and Simpson had excellent opportunities to scrutinize the two robbers. Afterwards, they gave the police detailed joint descriptions of the culprits, one of which depicted appellant reasonably well. In addition, Reznick selected appellant's photograph out of "a box of pictures" given him by the police shortly after appellant's arrest. This evidence, we hold, was sufficient to support the finding that Reznick's identification was not tainted by the cellblock confrontation.[43]

As to Simpson, who made no prior photographic identification, the proof on independent source for his in-court identification included a very significant event. On the night of appellant's arrest, Simpson was brought to police headquarters to identify him. According to the uncontradicted testimony of Detective Keahon,

> "when Mr. Simpson walked into the office, he saw Frazier and he said: There's the man that approached me in the back and stated, this is a holdup. And at the same time the Defendant Frazier shook his head; and I asked him what did he mean by shaking his head; and he said: Yes, that is the man that was behind the meat counter."

■ Ordinarily, an identification arising out of so suggestive a confrontation would itself be constitutionally dubious.[44] Here, however, not only did Simpson identify appellant, but appellant also identified Simpson. There can be no doubt on the record that by "the man that was behind the meat counter," appellant referred to Simpson's presence there at the time of the robbery. At this juncture, his urge to confess was so strong that he even acted out one of the other holdups to which he had confessed in order to convince hesitant eyewitnesses to that crime that he had indeed been the perpetrator. His statement, however, is relevant here, not because it is evidence of guilt and thus, indirectly, of the reliability of Simpson's identification, but rather because it tends directly to confirm the existence of an independent source for the challenged identification. And, with this, there could hardly be

---

40. The jury did hear a reference to the cellblock confrontation during the direct examination of Reznick. However, even if Reznick's reference amounted to an unintentional introduction into evidence of the out-of-court episode, there was no error if this identification, like its in-court sequel, had an "independent source." Clemons v. United States, *supra* note 38, 133 U.S.App.D.C. at 45, 408 F.2d at 1248.

41. United States v. Wade, *supra* note 3, 388 U.S. at 240, 87 S.Ct. 1926, 18 L.Ed. 2d 1149; Gilbert v. California, *supra* note 3, 388 U.S. at 272, 87 S.Ct. 1951, 18 L.Ed.2d 1178; Clemons v. United States, *supra* note 38, 133 U.S.App.D.C. at 34, 408 F.2d at 1237; Wright v. United States, *supra* note 37, 131 U.S. App.D.C. at 284, 404 F.2d 1261.

42. In Clemons v. United States, *supra* note 38, 133 U.S.App.D.C. at 33, 38 of 408 F.2d 1236, 1241, we emphasized the importance of the trial court's considered judgment on this question in the absence of further enlightenment by the Supreme Court. See also *id.*, opinion of Judge Leventhal, 133 U.S.App.D.C. at 49, 408 F.2d at 1252.

43. The reliability of Reznick's in-court identification is additionally supported by appellant's concession that Simpson had correctly identified appellant as a participant in Meridian Market robbery. See the text *infra* at note 45.

44. Compare Clemons v. United States, *supra* note 38; Wright v. United States, *supra* note 37, 131 U.S.App.D.C. at 56, 404 F.2d at 1259.

any "substantial likelihood of irreparable mistaken identification." [45]

We remand the case to the District Court for proceedings consistent with this opinion.

Remanded.

BURGER, Circuit Judge (concurring in part and dissenting in part):

I agree that the identification testimony was properly admitted under the principles recently set forth by this court in Clemons v. United States, 133 U.S. App.D.C. 27, 408 F.2d 1230 (Dec. 6, 1968) *en banc,* but I do not agree with those parts of the majority opinion relating to the inadmissibility of statements which Appellant made to the police.

### (1)

The sole issue separating me from the majority is whether Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) required Appellant's statements to be excluded from the evidence.

In answering this question affirmatively the majority leans heavily on Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957), the standing of which has been drawn into serious doubt by recent Congressional enactments.[1] The majority's cognizance [2] of the message that this series of legislation bears for *Mallory* and their apparent agreement with the lower court's finding that *Mallory* was not violated here,[3] belies *Mallory's* true significance to the issues at hand. Moreover it is unsound to treat *Mallory* and *Miranda* as closely related; the former is a quantitive test of time delay, the latter is a qualitative test of the circumstances of the interrogation.[4]

Of more concern is the majority's expansion of *Miranda* into a *per se* exclusionary rule, thereby transcending the Fifth Amendment requirement that only those statements elicited through *compulsion* be excluded from evidence. Indeed, *Miranda* itself cannot be read as going beyond the language of the Fifth Amendment.[5] Any lingering doubts on

---

45. Simmons v. United States, *supra* note 36, 390 U.S. at 384, 88 S.Ct. 967, 19 L. Ed.2d 1247; Clemons v. United States, *supra* note 38, 133 U.S.App.D.C. at 47, 408 F.2d at 1250.

1. Omnibus Crime Control and Safe Streets Act of 1968, 82 Stat. 197 (1968); District of Columbia Crime Bill, 81 Stat. 734 (1967).

2. *See* majority opinion at notes 7–9 and accompanying text. The majority mentions only the District of Columbia Bill, but the Omnibus Act is also relevant. Its Title II substantially incorporates Title III of the District of Columbia Crime Bill. *See generally,* Note, Title II of the Omnibus Crime Control Act: A Study in Constitutional Conflict, 57 Geo.L.J. 438 (1968). *And see* Bell v. Maryland, 378 U.S. 226, 84 S.Ct. 1814, 12 L.Ed.2d 822 (1964), dealing with the question of legislative retroactivity.

3. In *Mallory* the exclusion of confessions rested on supervisory powers, not on the Constitution. Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957); *see* McNabb v. United States, 318 U.S. 332, 340, 63 S.Ct. 608, 87 L.Ed. 819 (1943).

4. Herman, The Supreme Court and Restrictions on Police Interrogation, 25 Ohio L.J. 449, 451 (1961). In any event, *Mallory* has never been interpreted as requiring the police to terminate an interview for purposes of arraignment when a suspect wants to make a confession of guilt. In Fuller v. United States, 132 U.S.App.D.C. 264, 273 & n. 13, 407 F.2d 1199, 1208 & n. 13 (1967), reheard *en banc* on other issues Fuller v. United States, No. 19,532 (D.C. Cir., decided September 26, 1968), Judge Leventhal noted: "Rule 5(a) did not require that the detectives break off the interview and try to arraign appellant rather than allow him to make an immediate elaboration of the mere assertion of guilt". (Citing Walton v. United States, 334 F.2d 343, 347 (10th Cir. 1964), cert. denied *sub nom.* Comley v. United States, 379 U.S. 991, 85 S.Ct. 706, 13 L.Ed.2d 612 (1965).)

5. The *Miranda* Court expressly disclaimed any intention to traverse beyond the strictures of the Constitution. At the outset of its opinion the Court stated, "We start here * * * with the premise that our holding is not an innovation

this score were resolved by a recent exposition on the subject by the Supreme Court. In discussing the scope of *Miranda* the Court pertinently noted in Hoffa v. United States, 385 U.S. 293, 303–04, 87 S.Ct. 408, 414, 17 L.Ed.2d 374 (1966), that, "since at least as long ago as 1807, when Chief Justice Marshall first gave attention to the matter in the trial of Aaron Burr, all have agreed that a necessary element of compulsory self-incrimination is *some kind of compulsion*." (Emphasis added) (footnote omitted)

In *Miranda* the Supreme Court held that certain warnings must be given to a suspect before "custodial interrogation" could be conducted. The underlying assumption was that these warnings were necessary to prevent the subversion of trial rights at unsupervised pretrial confrontations between an accused and the State. Whereas pre-*Miranda* cases had alternately invoked the Fifth and Sixth Amendments [6] *Miranda* made clear that the Fifth Amendment was the central value at stake. The articulation of a stringent waiver requirement was merely a device through which the Court sought to ensure that Fifth Amendment guarantees were not unduly impaired at pretrial interrogations. The guidelines set forth in *Miranda* were means servicing constitutionally prescribed ends; as artifices of implementation they are subordinate and only incidental to the rights they were designed to secure. By postulating a waiver concept the Court did not intend to eclipse the threshold inquiries into the presence of compulsion and the quality of police conduct attending the making of inculpatory statements. This is the background of controlling legal principles on which this case ought to be decided. I do not agree that they give rise to a plausible claim of improper police tactics amounting to coercion requiring reversal or remand.

(2)

Frazier was presented to Officer Keahon at headquarters at 5:20 P. M. Their meeting was prefaced by Keahon's reading the *Miranda* warnings to him from PD-47 (a form card which all police officers carry and which had previously been read to Frazier by Officer Sandy upon his arrest). He repeated these warnings to Frazier when he read PD-54, a form which advised him of his Fifth and Sixth Amendment rights [7] and contained a statement of an intention to waive his right to remain silent and his right to counsel. Thereafter, at 5:30 P. M., Frazier himself read this form, orally stated that he understood its meaning,[8] and signed the waiver.

Officer Keahon testified that he then read the arrest warrant relating to the robbery of Mike's Carry Out Shop and

in our jurisprudence, but is an application of principles long recognized and applied in other settings". 384 U.S. at 442, 86 S.Ct. at 1611.

6. *Compare* Escobedo v. Illinois, 378 U.S. 478, 491, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964) *and* Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), *with* Ashcraft v. Tennessee, 322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192 (1944) *and* Brown v. Mississippi, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936).

7. The warning reads as follows:
 You are under arrest. Before we ask you any questions, you must understand what your rights are. You have the right to remain silent. You are not required to say anything to us at any time or to answer any questions. Anything you say can be used against you in Court. You have the right to talk to a lawyer for advise [*sic*] before we question you and to have him with you during questioning. If you cannot afford a lawyer and want one, a lawyer will be provided for you. If you want to answer questions now without a lawyer, you will still have the right to stop answering questions at any time. You also have the right to stop answering at any time until you talk to a lawyer.

8. Officer Keahon testified as follows: "He [Frazier] stated that he did understand the form and that he did not want a lawyer. * * * He stated 'If I need a lawyer, I will get one in the morning.'" [Tr. 63–64.]

started to question Frazier on that robbery. But, after Keahon had spoken but a few words, Frazier blurted out his desire to clear a third person who had been arrested for the robbery and shooting at a High's Store. Within minutes Frazier, by way of exculpating others, admitted to his involvement in the robberies at the High's Store, at Mike's Carry Out Shop, at the Dodge Market, and at the Meridian Market—the last robbery being the one for which he was convicted in this case. During this discourse Frazier objected to Officer Keahon's taking written notes. Keahon testified: "At the beginning of his admission, I started to write notes, and he stopped me and said: 'Don't write anything down. I will tell you about this but I don't want you to write anything down.'" [Tr. 72.]

The admission of the Meridian Market robbery was unsolicited and appears to have been volunteered. Officer Keahon testified that he did not ask Frazier whether he participated in the Meridian Market robbery and that the only questions asked in relation to that robbery during the initial confession were for the purpose of corroborating the identification of the market. Thus it seems that the confession was totally spontaneous and voluntary.

Following the statements Frazier was retained in the robbery squad office for nearly two hours, where he was quizzed in detail about the four robberies, reiterated his confessions, was displayed to several witnesses, and reenacted several of the robberies. Thereafter he was placed in a cell for the night because a Commissioner was not available and was presented the following morning.

(3)

The record demonstrates entirely reasonable police activity satisfying the deterrent purposes underlying the *Miranda* rule. There is not a scintilla of evidence suggesting that what had been forthcoming from Appellant's lips was the result of unreasonable or improper police conduct. The fact that Appellant may not have desired the statement to be transcribed does not compel the conclusion that he was being subjected to the kind of police activity found unconscionable in *Miranda*. The most that can be said from Appellant's statements is that he may have *unintentionally* incriminated himself. The Fifth Amendment, however, serves neither to discourage nor to prohibit self-incrimination, it militates only against *compulsory* self-incrimination. The record does not even remotely suggest that Appellant was being compelled to incriminate himself, no less compelled to utter any words at all. There is not the slightest indication that Appellant was unaware of his rights or labored under a misbelief that his failure to speak could be used against him as evidence of guilt. There is no intimation that the environment would have neither permitted nor honored a non-waiver.

In fact, no issue is even purportedly raised as to Appellant's willingness to make the statements that were eventually used against him. Indeed, evidence of his volition may be inferred from his voluntary participation later that evening in a series of identification procedures. In view of the obvious spontaneity surrounding its making, the statement could plainly have been used as a threshold oral confession.[9]

In this regard it also bears noting that the "plus factors" so frequently contributing to a rejection of a confession are not present in this case. Frazier was repeatedly told of his right to counsel and his right to remain silent; he confessed immediately and without prior denials; he never repudiated his confession and he did not make any allega-

---

9. *E. g.*, United States v. Mitchell, 322 U.S. 65, 64 S.Ct. 896, 88 L.Ed. 1140 (1944); Bailey v. United States, 117 U.S.App.D.C. 241, 328 F.2d 542 (1964) (Miller, J.); Jackson v. United States, 114 U.S.App.D.C. 181, 313 F.2d 572 (1962) (Edgerton, J.); Metoyer v. United States, 102 U.S.App.D.C. 62, 250 F.2d 30 (1957) (Burger, J.).

tions of coercive threats or physical abuses.[10]

By equating Frazier's insistence that the police not write notes with a desire not to incriminate himself, the majority engages in sheer speculation of Appellant's thought processes which places a premium on the capacity of judges to probe Appellant's mind. This approach bears an unfortunate resemblance to the sophistry engaged in by the courts which labored under the albatross of Betts v. Brady.[11] Indeed, the rule requiring

10. *Compare, e. g.,* Greenwell v. United States, 119 U.S.App.D.C. 43, 336 F.2d 962 (1964) (allegations of coercion); Spriggs v. United States, 118 U.S.App. D.C. 248, 335 F.2d 283 (1963) (prior denials; repudiation of the confession).

11. 316 U.S. 455, 62 S.Ct. 1252, 86 L.Ed. 1595 (1942), in which the "special circumstances" doctrine was evolved to determine the necessity for counsel in noncapital offenses.

12. By the time of *Miranda, Betts* had already been overruled by Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), holding the right to counsel universally applicable at trial in felony cases without regard to "special circumstances". In Cicenia v. Lagay, 357 U.S. 504, 78 S.Ct. 1297, 2 L.Ed.2d 1523 (1958), and Crooker v. California, 357 U.S. 433, 78 S.Ct. 1287, 2 L.Ed.2d 1448 (1958), the *Betts* analysis had been directly transposed on the determination of the admissibility of a confession. Both of these cases were distinguished and partially overruled in Escobedo v. Illinois, 378 U.S. 478, 491–492, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), and were completely overruled in *Miranda, supra* at 479 n. 8, 86 S.Ct. 1602, 16 L.Ed.2d 694. Of special interest is the discussion and rejection in *Miranda* of the "special circumstances" into which the rule of *Betts* necessitated an inquiry. *Id.* at 468–469 & n. 38, 86 S.Ct. 1602, 16 L.Ed. 2d 694.

13. Analogously, in the arrest area a suspect's testimony of his understanding of the events
would not be decisive but would be material. *Compare* United States v. McKethan, 247 F.Supp. 324, 328–329 (D.D.C.1965), aff'd by order (D.C. Cir.No. 20059, 1966), where Judge Youngdahl states "the test must be not what the defendant himself

courts to peer through kaleidoscopes in search of constitutional violations inevitably deteriorated into measuring the constitutional right in terms of the suspect's need—and invariably a horribly guilty suspect at that. Although this theory received currency during the era of "special circumstances", twenty years of inconsistent application which produced no judicially manageable standards eventually persuaded the Supreme Court in *Miranda*[12] to turn to an essentially *objective*[13] mode of analysis.

* * * thought, but what a reasonable man, innocent of any crime, would have thought had he been in the defendant's shoes, * * * a reasonable man, interpreting these words [of the detective] and the acts accompanying them * * *." *McKethan* has recently been cited with approval in Hicks v. United States, 127 U.S.App. D.C. 209, 382 F.2d 158 (July 7, 1967).

Fuller v. United States, 132 U.S.App. D.C. 264, 273 n. 11, 407 F.2d 1199, 1208 n. 11 (1967) (Leventhal, J.), reheard *en banc* on other issues Fuller v. United States, No. 19,532 (D.C.Cir., decided September 26, 1968).

As Judge Bazelon's dissent in Hall v. United States, (D.C.Cir., decided February 24, 1969) indicates, he too would subscribe to "reasonableness" of police conduct as the touchstone of exclusionary rules. Judge Bazelon said there, echoing a multitude of judicial holdings

It is not searches and seizures as such which the Fourth Amendment enjoins, but only "unreasonable searches and seizures," and the reasonableness of police conduct under the Fourth Amendment is ordinarily gauged by what the police reasonably and in good faith believed to be the facts at the time of their action. Thus, an arrest made on probable cause is not invalidated because the police were in fact mistaken in their good faith reasonable belief. * * *

I fail to see how admission of the fruits of such police conduct could sully the integrity of the judicial process. Here was no shocking affront to the dignity of a citizen, *cf.* Rochin v. California, 342 U.S. 165 [72 S.Ct. 205, 96 L.Ed. 183] (1952), no police "contempt for law," no "flagrant disregard" of prescribed procedures, no "willful disobedience of (the) * * * Constitution. * * *" (slip op. at 6, 9)

Since the underlying purpose of *Miranda* was to curb police improprieties, the use of objective criterion provided courts with a more workable method of evaluating the reasonableness of police conduct. The unhappy theory holding the police accountable for environmental and personality factors unavoidably unique to each suspect and frequently beyond the pale of police perception came to rest in the shadow of an exclusionary rule grounded in deterrence. Indeed, the Supreme Court in Johnson v. New Jersey [14] confirmed the essentially deterrent underpinnings of *Miranda* and thereby placed its imprimatur on an interpretation focusing on the reasonableness of police conduct instead of the vagaries of human nature.

*Miranda* did not set down a *per se* proscription against pretrial questioning; it was addressed primarily to abusive and unwarranted tactics designed to subvert constitutional rights. Even if Frazier unwittingly incriminated himself, the police should not be held accountable in the absence of some evidence of deceit or misconduct on their part. Here, of course, there is no such evidence. Indeed, the majority clothes Appellant's remarks with a significance bearing no relationship to the record or to ordinary human experience. Throughout the majority opinion is circumspect avoidance of any discussion relating to coercion or improper police conduct. To the extent Appellant's utterances may be construed as indicating a misunderstanding of the consequences of his making incriminatory statements the majority has failed to supply a nexus between this and the presence of improper police conduct amounting to coercion.

I have difficulty perceiving the basis for the majority's argument that it was unreasonable for the police to proceed with questions *after* Frazier made an apparently valid waiver. Although this waiver was not irrevocable,[15] there is nothing to show that Frazier indicated "in any manner, at any time prior to or during questioning, that he wish[ed] to remain silent" or that he wanted an attorney. Miranda v. Arizona, *supra* at 473–474, 86 S.Ct. at 1627.

Having complied with the postulates of *Miranda*, it was the absolute duty of the police as law enforcement agents to investigate promptly the circumstances of the crime and the suspect's possible participation. I am somewhat at a loss to know what more the Government could or should have done to comply with the directives of *Miranda*. Even if Frazier did not understand the privilege against self-incrimination, the majority's approach is unrealistic and goes beyond the mandates of any decided cases. It seemingly expects the police to detect indications of misunderstanding and lack of knowledge which are so subtle that

Although the *Hall* case involved the Fourth Amendment everything said in the dissent relates equally to the exclusion of reliable evidence under the Fifth Amendment; *see* Boyd v. United States, 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746 (1886); where the Court noted that "the fourth and fifth amendments run almost into each other." *Compare* Note, Consent Searches: A Reappraisal After Miranda v. Arizona, 67 COLUM.L. REV. 130 (1967).

Just as reasonableness has been the guidepost for protecting privacy, it also serves as the basis for determining the existence of compulsion. In assessing the legality of an arrest the question is framed in terms of whether the police officer had probable cause to believe a crime had been committed; similarly, in determining the admissibility of a confession, the question is whether there was sufficient reason for the police to believe that the suspect had consented to being questioned. In both instances the judicially declared objective of the rules is to prevent the police from reaping the benefit of official misconduct. Here Appellant is unable even to allege any police misconduct, hence the underlying predicate of the exclusionary rule is totally absent. In such circumstances there can be no justification for suppressing the evidence.

14. 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed. 2d 882 (1966), holding *Miranda* not retroactive.

15. Miranda v. Arizona, *supra* at 444–445, 86 S.Ct. 1602, 16 L.Ed.2d 694.

not even judges would recognize the problem.

The seeming anxiety of judges to protect every accused person from every consequence of his voluntary utterances is giving rise to myriad rules, sub-rules, variations and exceptions which even the most alert and sophisticated lawyers and judges are taxed to follow. Each time judges add nuances to these "rules" we make it less likely that any police officer will be able to follow the guidelines we lay down. We are approaching the predicament of the centipede on the fly-paper—each time one leg is placed to give support for relief of a leg already "stuck", another becomes captive and soon all are securely immobilized. Like the hapless centipede on the flypaper, our efforts to extricate ourselves from this self-imposed dilemma will, if we keep it up, soon have all of us immobilized. We are well on our way to forbidding *any* utterance of an accused to be used against him unless it is made in open court. Guilt or innocence becomes irrelevant in the criminal trial as we flounder in a morass of artificial rules poorly conceived and often impossible of application.

The record raises the possibility that the only statements put into evidence were those made *prior* in time to Appellant's alleged equivocations.[16] Police who act reasonably on facts presently in their possession should not be ascribed a taint by virtue of subsequent utterances of a suspect which might be said to exhibit symptoms forbidden by *Miranda*. The use of such a relating-back theory does violence to *Miranda* [17] and brings us beyond the point of diminishing return in enforcing an exclusionary rule grounded in deterrence of proscribed police conduct.[18] The Constitution does not prohibit police interrogation of suspects who have waived the right to counsel and the majority opinion will not and should not impede interrogation after a waiver. What the holding will do is confuse and baffle police—as it will many judges.

16. Although the majority argues that the record unambiguously demonstrates the contrary, *see* note 30 of majority opinion, it is unnecessary to resolve their speculation since the precise moment of these equivocations is not crucial either to the majority's or to my theory of the case. The majority neither claims nor are they able to demonstrate how the precise moment of equivocal utterance is relevant for determining the breadth of Appellant's understanding of his rights. Similarly, since the police would have been acting well within the bounds of reason by questioning the suspect *after* he had equivocated, *a fortiori* it would have been proper for them to question him before. That the moment of equivocal utterance is totally unrelated to determining the *reasonableness* of police conduct is further indicated by the majority's careful abstention from any discussion of the one issue on which this case turns.

17. *Cf., e. g.,* cases cited in note 9, *supra.* In these cases the Court held that "unnecessary delay" occurring *after* a confession does not retroactively infect the confession. *See also* Bayer v. United States, 331 U.S. 532, 67 S.Ct. 1394, 91 L.Ed. 1654 (1947).

18. *Cf.* Thornton v. United States, 125 U.S. App.D.C. 114, 119–120, 368 F.2d 822, 827–828 (1966), holding that an unconstitutional seizure is not a proper ground for collateral attack; Amsterdam, Search, Seizure, and Section 2255: A Comment, 112 U.Pa.L.Rev. 378, 389–390 (1964). *See also* the dissenting opinion of Judge Bazelon in Hall v. United States, (D.C. Cir., decided February 24, 1969) where he states: "Even if a search that was reasonable *when made* can be retroactively invalidated under the Fourth Amendment, such a search does not taint either its fruits, or, through them, the judicial process." (Slip op. at p. 9) (emphasis added.)